**Francis X. CLEARY, Plaintiff,**

v.

**UNITED STATES LINES, INC. and United States Lines Operations, Inc., Defendants.**

Civ. A. No. 81–1766.

United States District Court, D. New Jersey.

Jan. 27, 1983.

Bourne, Noll & Kenyon, P.A. by Steven P. Kartzman, Summit, N.J., for plaintiff.

Meyner & Landis by John N. Malyska, and Geralyn A. Boccher, Newark, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

Plaintiff, Francis Cleary, is a 64 year-old American citizen who was employed in England by one of the defendants, United States Lines Operations, Inc. ("Operations"). In 1979, Mr. Cleary's employment was terminated by the company. That termination, Mr. Cleary alleges, was unlawful and violated his rights under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34. Defendants have moved for summary judgment. Among the questions that this court must determine is whether the ADEA applies to American citizens working for United States companies in offices in foreign countries.

Mr. Cleary began his employment with defendant United States Lines, Inc. ("USL"), in 1946 as a clerk in the company's offices. Over the following 33 years, plaintiff worked either for USL or for Operations. USL is a Delaware corporation having its principal place of business in Cranford, New Jersey. The company is engaged in the international transportation of cargo and has offices throughout the world. Operations is a New York corporation which is wholly owned by USL. Operations has its principal place of business in London and acts as an agent for USL in shipping cargo throughout Europe. Operations does not conduct any business in the United States and is not licensed by the Interstate Commerce Commission to engage in interstate commerce. All ten officers of Operations and four of its five directors are also officers and directors of USL.

Combined, USL's European division and Operations employ 350 persons in Europe. Only 11 of these employees are American nationals, the remainder are either citizens of the host country or third-country nationals. Employees of USL and Operations are freely transferred between each company.

Since 1956, plaintiff has been employed full time in Europe either by USL or by one of its subsidiaries. In 1967, Mr. Cleary was transferred from USL in Germany to Operations in London. As an American working abroad, Mr. Cleary received benefits from defendants that were not available to British or third-country nationals working in England. In particular, plaintiff was paid a cost of living allowance as compensation for the difference in exchange rates, was provided with transportation to the United States once a year for himself and for his family, was reimbursed for income taxes paid to the United Kingdom in excess of what he would have paid to the United States Government were he working here, was included in USL's retirement fund, and had his check deposited in a New York bank.

When plaintiff began his employment with Operations in 1967, the company, as it was obligated to do under English law, furnished Mr. Cleary with a written statement of the terms of his employment. Mr. Cleary signed the statement and, in addition, executed a contract of employment

with Operations. The contract was similar to that offered to other employees of Operations. It made no mention of ADEA coverage directly or indirectly.

On June 18, 1979, plaintiff was advised that his employment was being terminated and that his last day of work would be on June 22, 1979. Who made the decision to fire Mr. Cleary is disputed. Defendants contend that the decision was made and executed in London by A.J. Mayor, vice president of USL's European division and vice president of Operations. Plaintiff, on the other hand, contends that the decision was not final until William Bru, chairman of the board and chief executive officer of defendants, was consulted. Mr. Bru's office was in New York at the time of Mr. Cleary's termination.

When plaintiff was terminated, he was at first told that his job had been eliminated due to a structural reorganization. Subsequently, defendants stated that the dismissal was for poor job performance and for failure to improve despite repeated warnings. Mr. Cleary denies these contentions; he alleges that he was never notified, either orally or in writing, that his performance did not meet company standards. To support this claim, plaintiff has submitted as an exhibit a letter from defendants' vice president William Brinkman. The letter, which advised Mr. Cleary that he would be receiving a salary increase effective January 1, 1978, stated:

> In reviewing your performance, one can [sic] be impressed by the total commitment you have for your work. There is no doubt that your good relationship with our Military friends contributes to the well being of our Company, and that your involvement is instrumental in our Military Receivables being as well under control as they are.

In addition to Mr. Brinkman's letter, the record discloses a job evaluation, dated January 3, 1979, in which Mr. Cleary's overall performance was rated as being "Above Satisfactory". For the first quarter of 1979, Mr. Cleary received a $658.00 bonus. On June 8, 1979, ten days before he was notified of his termination, plaintiff alleges that he was informed by his immediate superior, Robert Splan, that he was going to be transferred to USL's corporate headquarters in Cranford, New Jersey.

From June 22, 1979 to August 23, 1979, correspondence was exchanged by plaintiff and defendants regarding the terms and conditions of termination. In a letter to Mr. Cleary dated June 22, Mr. Mayor confirmed Mr. Cleary's discharge and outlined his termination benefits. Mr. Mayor stated that Mr. Cleary was entitled to severance compensation calculated at the rate of one week's pay for each of plaintiff's 33 years of service, plus five weeks of vacation pay. In the letter, Mr. Mayor also stated that Mr. Cleary and his family would be reimbursed for the expense of moving to any destination chosen so long as the move was made by January 1, 1980. In lieu of a physical move, plaintiff was advised that he could elect a cash settlement based upon three bids from moving companies to be submitted by Mr. Cleary.

In a letter dated June 26, 1979, Mr. Cleary responded to Mr. Mayor that his outline of the termination benefits to which Mr. Cleary was entitled did not comport with company policy. Mr. Cleary stated that he should be granted at least two weeks' salary for each year of service because of his unblemished record and because that is what other senior employees had been paid upon separation. In addition, because he was uncertain of his future plans, Mr. Cleary stated that he would accept a cash settlement to cover relocation expenses. He also requested an allowance for air fare to London from the United States so that his children, who had lived in London but were attending school in the United States, could return to settle their affairs. Finally, plaintiff requested that he receive compensation to cover four round-trip air fare tickets, representing his usual allowance for "home leave", which he had planned to take in late July.

On July 3, 1979, Mr. Mayor advised plaintiff that a full year of severance pay and five weeks of vacation pay would be grant-

ed, but that no allowance would be permitted for "home leave" or for travel expenses to London for Mr. Cleary's children. In addition, Mr. Mayor stated that a cash settlement for relocation would not be granted but that instead plaintiff would be reimbursed for actual costs incurred for relocating to the United States. No time was mentioned in the letter by which Mr. Cleary would have to return to the United States to be reimbursed for relocation costs. In the letter, it was stated that benefits not specifically mentioned in the letter would be paid in accordance with company policy. At the bottom of the letter, above a blank line for Mr. Cleary's signature, was the following statement: "The terms of this letter are agreed to by the undersigned." This statement was executed by Mr. Cleary and was returned with a cover letter dated July 13, 1979, in which Mr. Cleary stated: "I am returning herewith a copy of your letter dated July 3, 1979, duly signed by me signifying acceptance of the terms contained therein covering my separation from United States Lines, effective June 22, 1979."

Four days later, on July 17, 1979, Mr. Cleary sent a letter to Mr. Mayor and submitted three bids for relocation from London to the United States. In the letter, Mr. Cleary noted that if a cash settlement were not paid, defendants would bear the risk of escalated moving and air fare costs at the time that the actual relocation took place.

Mr. Grant, USL's personnel director, answered Mr. Cleary's letter to Mr. Mayor on July 26, 1979. In the letter, Mr. Grant stated that Mr. Cleary would have to relocate to the United States within three months from the date of his termination to qualify for the reimbursement of relocation costs. On August 20, 1979, Mr. Cleary, responding to Mr. Grant, objected to the three-month limitation, stated that it violated company policy, and re-stated his preference for a cash settlement. Three days later, Mr. Grant responded by extending the time for relocation until December 31, 1979, and by denying Mr. Cleary's request for a cash settlement.

Mr. Cleary subsequently retained solicitors in London. On September 20, 1979, plaintiff's solicitors filed a complaint on his behalf with the London Industrial Tribunal. The complaint alleged that defendants had violated the law by discharging Mr. Cleary without giving him three months' notice as was required by English law. Defendants interposed defenses and on January 28, 1980, a settlement was reached which obtained the approval of the Industrial Tribunal. The settlement agreement stated that Operations would pay to Mr. Cleary

the sum of £ 7,556 in full and final settlement of these proceedings and of all other (if any) claims which [Mr. Cleary] could have brought in the United Kingdom against [Operations] arising under the terms of his contract of employment or out of his dismissal.

In an affidavit filed with this court, one of Mr. Cleary's solicitors stated that the limitation of the settlement to claims which could have been brought in the United Kingdom was intended to preserve Mr. Cleary's claims under the ADEA which had been previously filed in the United States.

Plaintiff's age discrimination claim had been filed with the EEOC on November 29, 1979, 180 days after his discharge. On January 15, 1980, the EEOC began the conciliation process. About four months later, on May 14, 1980, the EEOC advised Mr. Cleary that its attempt at conciliation had not succeeded and stated that plaintiff should file a charge of unlawful discrimination with the New Jersey Division on Civil Rights. A charge had already been filed with New Jersey, however, on November 28, 1979, 159 days after Mr. Cleary's termination. Defendants' general counsel, William Verdon, had been provided with a copy of the EEOC and New Jersey filings by plaintiff on January 11, 1980.

On July 23, 1980, the New Jersey Division on Civil Rights notified Mr. Cleary that it would not exercise jurisdiction because plaintiff was not an "inhabitant" of New Jersey. At the time plaintiff's charge was filed with the New Jersey agency, USL's headquarters were located in the state. At

the time of plaintiff's termination, however, USL's headquarters were located in New York.

Plaintiff filed a complaint with this court on June 9, 1981, alleging violations of the ADEA. In the answer subsequently filed, defendants contended that because USL was located in New York at the time of Mr. Cleary's termination, the cause of action arose, "if not in London, England, then in New York, New York." Responding to defendants' contention, plaintiff filed a charge of discrimination on November 30, 1981, over two years after his dismissal, with the New York State Division on Human Rights. On March 4, 1982, New York declined jurisdiction over the complaint because it had been filed over one year after the alleged act of discrimination occurred.

In this action, plaintiff seeks to have his severance pay supplemented with one year's cost of living allowance, and seeks further compensation for relocation, an allowance for home leave, interest, costs, attorney's fees, liquidated damages, and such other relief as the court may deem appropriate.

## DISCUSSION OF THE LAW

Defendants contend that plaintiff's action is barred by the doctrine of election of remedies because two mutually exclusive sets of facts are being alleged to support jurisdiction under the laws of two nations, England and the United States. By voluntarily choosing to bring suit against Operations in England, defendants allege, plaintiff has admitted that his employment rights are governed by the laws of that country. Therefore, defendants reason, plaintiff cannot consistently maintain that he is also protected under United States law.

Plaintiff, on the other hand, alleges that the jurisdictional facts he has asserted are not at all inconsistent. Plaintiff contends that whether an individual has rights under England's Employment Protection (Consolidation) Act of 1978, depends upon the situs of one's employment and not one's nationality. The Act, which does not prohibit age discrimination, but does clothe employees with certain rights upon dismissal from employment, defines, in Section 141, the class of persons excluded from the coverage of the Act:

[T]his Act shall not apply in relation to employment during any period when the employee is engaged in work wholly or mainly outside Great Britain unless the employee ordinarily works in Great Britain and the work outside Great Britain is for the same employer.

■ Plaintiff therefore is correct that a United States citizen working full time in England, is entitled to the protections of the English Act. In addition, there is no reason why that same individual cannot consistently claim also to be entitled to protections under United States law, especially where, as here, the rights asserted under each law are fundamentally different. Plaintiff's claim under English law was for the failure of his employer to comply with minimum notice requirements for termination. His claim under United States law is for age discrimination.

■ The doctrine of election of remedies is a harsh doctrine which should be sparingly applied. *Newport News Shipbuilding and Dry Dock Company v. Director, Office of Workers' Compensation Programs, United States Department of Labor,* 583 F.2d 1273, 1277 (4th Cir.1978), *cert. denied,* 440 U.S. 915, 99 S.Ct. 1232, 59 L.Ed.2d 465 (1979). The rule prohibits a party, in asserting his rights, from occupying inconsistent positions "in relation to the facts which form the basis of his respective remedies." *Abdallah v. Abdallah,* 359 F.2d 170, 174 (3d Cir.1966). The purpose of the rule is to prevent double recoveries, forum shopping, and harassment of defendants by dual proceedings. *Consolidated Express, Inc. v. New York Shipping Association, Inc.,* 602 F.2d 494, 525 (3d Cir.1979), *vacated on other grounds,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980). Plaintiff's factual assertions do not threaten these values and are not inconsistent. To the extent that there is an overlap in the respective remedies under English and American law, defendants would be entitled to a credit for any duplicate awards.

The finding that plaintiff's factual assertions are not inconsistent, however, is not determinative of the issue of whether the United States laws prohibiting age discrimination have extraterritorial application. The court merely concludes that plaintiff is not prohibited from claiming protection under the laws of two nations. Whether United States citizens working for United States companies located in foreign nations are entitled to the protections of the ADEA, is a question which this court must address.

Defendants argue, however, that this issue can be avoided entirely if the court concludes that the settlement agreement approved in England by the Industrial Tribunal bars this lawsuit. The agreement provided that Operations would pay to Mr. Cleary

> the sum of £ 7,556 in full and final settlement of these proceedings and of all other (if any) claims which [Mr. Cleary] could have brought in the United Kingdom against [Operations] arising under the terms of his contract of employment or out of his dismissal.

Defendants contend that the language of the settlement agreement is unambiguous, that Mr. Cleary could have asserted his ADEA claims in the United Kingdom, and that, therefore, plaintiff's lawsuit is prohibited. In an affidavit filed by Mr. Cleary's solicitor, defendants' contentions are disputed. The solicitor, who represented Mr. Cleary before the Industrial Tribunal and who participated in the negotiation of the settlement agreement, avers that at the time of negotiation, plaintiff had age discrimination claims pending in the United States. Defendants had originally proposed that the settlement release them from "all claims in any jurisdiction", but, according to plaintiff's solicitor, this language was subsequently modified to permit continuation of the United States lawsuit. The final language, releasing defendants from "... all other claims the applicant could have brought in the United Kingdom ..." was thus, under plaintiff's interpretation, intended to bar plaintiff from bringing any further actions under English law but not to bar actions under United States law. Because plaintiff has established an ambiguity in the settlement agreement, a factual question exists as to the intent of the parties which cannot be resolved on a motion for summary judgment. Nevertheless, the question will be rendered moot if defendants are correct that the Age Discrimination in Employment Act does not apply extraterritorially, even assuming the parties' settlement agreement contemplated that such cause of action would survive.[1]

In determining whether the ADEA applies extraterritorially, the court is bound by the long-followed rule that unless a contrary intent appears, a statute should be construed to apply only within the territorial jurisdiction of the United States. *Blackmer v. United States,* 284 U.S. 421, 437, 52 S.Ct. 252, 254, 76 L.Ed. 375 (1932). The rule is predicated on the assumption that Congress, in enacting legislation, is primarily concerned with domestic conditions. *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949). Defendants argue that not only did Congress not intend the ADEA to apply beyond the borders of the United States, but that this intention was clearly expressed through the incorporation into the ADEA of provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19. Defendants' argument has considerable force.

1. Defendants also argue that Mr. Cleary's signature, approving of the benefits outlined in Mr. Mayor's July 3, 1979 letter, created an accord and satisfaction, thereby barring this lawsuit. Defendants are incorrect. Letters subsequent to Mr. Cleary's approval show that there still existed a live dispute between the parties. For example, the letter signed by Mr. Cleary did not impose a time limit on relocation, yet defendants subsequently sought to impose such a limitation. Moreover, even if an accord and satisfaction had been reached as to Mr. Cleary's severance benefits, the agreement would not bar an ADEA action but merely would require that defendants be given a credit for the amount of the termination benefits should plaintiff ultimately prevail on his claim at trial. *Laugesen v. Anaconda Company,* 510 F.2d 307, 317 (6th Cir.1975).

■ Section 626(b) of the ADEA incorporates various provisions of the Fair Labor Standards Act:

The provisions of this chapter *shall be enforced in accordance with the powers, remedies, and procedures* provided in sections 211(b), *216 (except for subsection (a) thereof),* and 217 of this title, and subsection (c) of this section.

29 U.S.C. § 626(b). (emphasis supplied).

Section 216(d) of the FLSA, cross-referenced above, provides:

In any action or proceeding ... no employer shall be subject to any liability or punishment under this chapter ... *on account of his failure to comply ... with respect to work heretofore or hereafter performed in a workplace to which the exemption in section 213(f) of this title is applicable....*

29 U.S.C. § 216(d). (emphasis supplied).

Section 213(f), referred to above, prohibits the extraterritorial application of the FLSA:

*[T]his title shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country.*

29 U.S.C. § 213(f). (emphasis supplied).

Plaintiff urges that in incorporating provisions of the FLSA into the ADEA, Congress did not intend to curtail an individual's substantive rights under the ADEA but only intended to create a procedural mechanism to enforce rights provided for by the statute. In particular, plaintiff relies upon the language of Section 626(b) of the ADEA, which states that the act shall be "*enforced* in accordance with the powers, remedies, and procedures" of the FLSA. 29 U.S.C. § 626(b). Plaintiff urges that the word "enforced" was used to create a dichotomy between substantive and procedural rights. The substantive rights created by the ADEA, plaintiff argues, are found in Section 623 of the Act, which states in part:

(a) It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ...

29 U.S.C. § 623(a)(1). These rights, the argument continues, are held by all American citizens within the reach of the commerce clause. In the ADEA, Congress has broadly defined commerce to include trade "... among the several States; *or between a State and any place outside thereof.*" 29 U.S.C. § 630(g) (emphasis supplied). In its statement of findings for the ADEA, Congress declared that "the existence in industries affecting commerce of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce." 29 U.S.C. § 621(a)(4). From the Act's statement of findings and its definition of commerce, plaintiff draws the conclusion that all persons within reach of the commerce clause are entitled to the protections of the Act.

Although plaintiff's argument has some appeal, it becomes attenuated when provisions of the ADEA relating to commerce are compared with provisions of the FLSA which are remarkably similar. In the FLSA's statement of findings, Congress has declared that

the existence, in industries engaged in commerce ... of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers ... (2) burdens commerce and the free flow of goods in commerce.

29 U.S.C. § 202(a)(2). Commerce is broadly defined under the FLSA as "... trade ... among the several States *or between any state and any place outside thereof.*" 29 U.S.C. § 203(b). (emphasis supplied).

Although both the FLSA and the ADEA contain ambitious statements of findings, and although both acts define commerce with the same breadth, plaintiff seeks to find added significance in the ADEA's provisions which mention commerce. Plaintiff cannot dispute that in clear terms, Section 213(f) of the FLSA restricts application of the Act to this country. Plaintiff also can-

not dispute that this restriction co-exists with the FLSA's expansive definition of commerce. Therefore, it is difficult to accept why the identical restriction, which has been incorporated into the ADEA, should not restrict application of the ADEA to this country's borders.[2] Drawing a distinction between the enforcement of rights and the rights themselves, as plaintiff does, fails to justify a difference in the reach of the Acts. Just as a United States citizen working abroad cannot enforce the provisions of the FLSA where he is paid substandard wages, he also cannot enforce the provisions of the ADEA where he is the victim of age discrimination, because the same territorial limitations are in effect under both Acts.

If Congress did not wish to restrict the territorial application of the ADEA, it could have eliminated its explicit incorporation of Section 213(f) of the FLSA into the Act. Congress did not do that, however. Therefore, this court must assume that Congress intended to retain the territorial restriction.[3]

The Supreme Court's decision in *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), is particularly enlightening with respect to the interrelationship of the ADEA and the FLSA. In *Lorillard*, the Court held that jury trials are available to private litigants under the ADEA because the Act incorporated provisions of the FLSA, which provided for such a right. In so holding, the Court noted: "Pursuant to . . . 29 U.S.C. § 626(b), violations of the ADEA generally are to be treated as violations of the FLSA." *Id.* at 578, 98 S.Ct. at 869. The Court then went on to state:

> [W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation

given to the incorporated law, at least insofar as it affects the new statute. *That presumption is particularly appropriate here since, in enacting the ADEA, Congress exhibited both a detailed knowledge of the FLSA provisions and their judicial interpretation and a willingness to depart from those provisions regarded as undesirable or inappropriate for incorporation.*

*Id.* at 581, 98 S.Ct. at 870. (emphasis supplied).

Plaintiff argues that there is good reason for restricting applicability of the provisions of the FLSA to workers employed in this country: if it were otherwise, wages required to be paid under the FLSA, where they varied greatly with the prevailing wage rate in the foreign country, would cause dislocations in the economy of the host country. Plaintiff contends that a similar threat to a foreign economy does not exist where our laws prohibiting age discrimination are extended to protect American employees working abroad. This court shares plaintiff's policy views. This does not, however, give the court license to substitute its own views for the views of Congress. If Congress wanted to exclude portions of the FLSA from being incorporated into the ADEA, it could have done so. For example, although the ADEA incorporates Section 216 of the FLSA, it specifically excludes Section 216(a) of the Act, the penalty provision, from incorporation.

Equally significant is that the investigatory apparatus of the EEOC[4] is not structured or empowered to function abroad. Under Section 626 of the ADEA, the EEOC, upon receiving a charge of age discrimination, is required to "promptly seek to elimi-

---

**2.** The National Labor Relations Act also defines commerce broadly, 29 U.S.C. § 152(6), yet has been held not to apply extraterritorially. *See, e.g., Benz v. Compania Naviera Hidalgo*, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957); *GTE Automatic Electric, Inc.*, 226 N.L.R.B. 1222 (1976).

**3.** The legislative history of the ADEA and its amendments is silent on whether the Act applies extraterritorially. *See* 1967 U.S.Code

Cong. and Adm.News 2213; 1978 U.S.Code Cong. and Adm.News 504.

**4.** The functions vested in the Secretary of Labor were transferred to the EEOC by section 2 of the 1978 Reorganization Plan No. 1, 43 F.R. 19807, 92 Stat. 3781, set out in the Appendix to Title 5, Government Organization and Employees.

nate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion." 29 U.S.C. § 626(d). The investigatory powers of the EEOC are set forth in Section 626(a), which incorporates by reference Sections 209 and 211 of the FLSA. Section 211(a) of the FLSA provides that the Administrator of the Act may investigate "any industry subject to this chapter." Section 211(c) of the Act requires "[e]very employer subject to any provision of this chapter" to keep records. As noted previously, the FLSA prohibits application of its provisions to employees rendering services in foreign countries. Section 213(f), which contains the restriction, specifically states that Section 211, which sets forth the powers of investigation and the requirements of record-keeping under the Act, is not applicable outside the territorial jurisdiction of the United States. If plaintiff were correct in arguing that the ADEA applies extraterritorially, it would be anomalous for Congress not to have authorized powers of investigation that were co-extensive with the reach of the Act. Congress did not do so, however. Instead, it specifically restricted the investigatory powers authorized by the Act to United States territories. Therefore, it is reasonable to infer that the substantive provisions of the ADEA were intended to be similarly restricted.

As authority for the proposition that the ADEA should apply extraterritorially, plaintiff cites *Vermilya-Brown Co. v. Connell,* 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76 (1948). In *Vermilya-Brown,* the Supreme Court held that work performed on a military base in Bermuda, which was leased to the United States by the government of Great Britain, was governed by the FLSA. In so holding, the Court determined that the leased territory was a "possession" and that therefore the FLSA, which applied to "possessions", 29 U.S.C. § 203(c), was applicable. There is no dispute that in *Vermilya-Brown,* the Court applied the FLSA extraterritorially. As noted by defendants, however, what is important about the case is not its holding, but the specific and unequivocal Congressional repudiation of it in

the 1957 amendment to the FLSA, which restricted the protections of the Act to the territorial jurisdiction of the United States. 29 U.S.C. § 213(f). In the Senate report on the amendment, it was specifically noted:

> The full scope of the possible coverage of the Fair Labor Standards Act was not appreciated until the decision of the United States Supreme Court in the case of *Vermilya-Brown Co. v. Connell,* 335 U.S. 377 [69 S.Ct. 140, 93 L.Ed. 76] (1948).

S.Rep. No. 987, 85th Cong., 1st Sess., 1957 U.S.Code Cong. & Adm.News 1756, 1757. The Report also noted:

> The purposes of this bill are ... to exclude from any possible coverage of the Fair Labor Standards Act *work performed by employees within a foreign country* (such as employees employed ... in an airline or steamship ticket office in a foreign port) by *limiting the coverage of the act to employees who perform work within a State of the United States*
> . . . .

*Id.* at 1756.

The ADEA was enacted after *Vermilya-Brown* was decided and after the FLSA was amended by Section 213(f). It must therefore be presumed, as the Supreme Court noted in *Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978), that in incorporating provisions of the FLSA into the ADEA, Congress was aware of the effect that such incorporation would have on the newly enacted age discrimination legislation. Application of that presumption to this case, mandates the conclusion that the ADEA was not intended by Congress to apply extraterritorially.

As noted previously, plaintiff emphasizes the importance of isolating the substantive guarantees of the ADEA from the enforcement provisions of the FLSA. The latter, plaintiff argues, were not intended to curtail substantive rights created under the ADEA. In pursuing this argument, plaintiff urges that the relevant statutory analogy to the substantive provisions of the ADEA is not the FLSA but Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e.

Plaintiff. is correct that the ADEA and Title VII share a common purpose, the elimination of discrimination in the work place. *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979). In fact, the prohibitions of Title VII and the prohibitions of the ADEA are virtually *in haec verba.* Section 2000e–2(a)(1) of Title VII, states:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

Similarly, Section 623 of the ADEA states:

(a) It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . .

29 U.S.C. § 623(a)(1).

In *Davis v. Calgon,* 627 F.2d 674 (3d Cir.1980), *cert. denied,* 449 U.S. 1101, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981), the Third Circuit recognized that interpretations of provisions of Title VII can provide guidance for interpreting similar provisions of the ADEA. Drawing on this principle, plaintiff concludes that because some courts have found that Title VII applies extraterritorially, the same result should follow under the ADEA. The major case cited by plaintiff to support the proposition that Title VII applies extraterritorially is *Bryant v. International Schools Services, Inc.,* 502 F.Supp. 472 (D.N.J.1980), *rev'd on other grounds,* 675 F.2d 562 (3d Cir.1982). *Bryant,* however, was reversed by the Third Circuit, which never reached the issue of the extraterritorial application of Title VII. 675 F.2d 562, at 571 n. 15. In *Bryant,* the district court found that Title VII applied to the employment practices of an American corporation operating schools in Iran.

Critical to the court's decision was language in Title VII, not found in the ADEA, exempting certain entities from its coverage:

This subchapter shall not apply to an employer with respect to the employment of *aliens outside any State,* or to a religious corporation.

42 U.S.C. § 2000e–1 (emphasis supplied).

From the above-quoted language, the court held that since Congress explicitly excluded aliens employed outside of any state from Title VII's coverage, then, by negative implication, Congress must have intended the Act to protect American citizens working for an American employer outside of any state. The court, in *Love v. Pullman Co.,* 13 FEP Cases 423 (D.Colo. 1976), used identical reasoning to conclude that American porters employed in Canada were protected by Title VII.

In arguing by analogy to Title VII that the ADEA should be applied extraterritorially, plaintiff thus not only principally relies upon a case which has been reversed but also, and more importantly, relies upon a provision of Title VII that it first asks the court to incorporate into the ADEA, even though Congress has not done so, and then asks the court to draw a negative inference therefrom. The court has no authority to engage in the type of judicial legislation sought by plaintiff. If anything, the provision found in Title VII but missing from the ADEA undercuts plaintiff's central argument: that the geographic restriction of the FLSA, because it affects substantive rights, is not incorporated into the ADEA. According to plaintiff, the ADEA's substantive provisions are modeled exclusively upon Title VII. Yet the one provision of Title VII, from which a negative inference can be drawn in favor of applying the Act extraterritorially, is noticeably absent from the ADEA. The only reasonable conclusion that can be drawn from the absence of this provision is that Congress did not intend the ADEA to apply abroad. This conclusion is supported by the explicit reference in the ADEA to the FLSA's territorial restriction. Plaintiff's analogy to Title VII, therefore, rather than aiding plaintiff's po-

sition, not only emphasizes that Congress intended to restrict the extraterritorial application of the ADEA, but also reinforces the conclusion that the ADEA's reference to the FLSA is not merely incidental but is instead an explicit restriction on the geographic reach of the ADEA.

Had Congress intended the ADEA to apply extraterritorially, it would have made specific provision for such application. Two examples of legislation which has specific extraterritorial provisions are the Defense Base Act, 42 U.S.C. § 1651, and the War Hazards Compensation Act, 42 U.S.C. § 1701(a).

The Defense Base Act provides:

(a) Except as herein modified, the provisions of the Longshoremen's and Harbor Workers' Compensation Act ... as amended, shall apply in respect to the injury or death of any employee engaged in employment—

(1) at any military, air, or naval base acquired ... by the United States from any foreign government; or

(2) upon any lands occupied or used by the United States for military or naval purposes *in any Territory or possession outside the continental United States* ... or;

(3) upon any public work *in any Territory or possession of the continental United States* ... if such employee is engaged in employment at such place under the contract of a contractor ... with the United States;

(4) under a contract entered into with the United States ... *where such contract is to be performed outside the continental United States and at places not within the areas described in subparagraphs (1) to (3) of this subdivision* ...;

(5) under a contract approved and financed by the United States ... *where such contract is to be performed outside the continental United States* ...;

(6) *outside the continental United States by an American employer providing welfare or similar services for the benefit of the Armed Forces pursuant to appropri-*

*ate authorization by the Secretary of Defense.*

42 U.S.C. § 1651(a) (emphasis supplied).

The War Hazards Compensation Act provides benefits for injury, death, capture or detention resulting from a war-risk hazard. The Act covers

(1) ... any person employed by a contractor with the United States, if such person is an employee specified in the [Defense Base Act] ...; or

(2) ... any person engaged by the United States under a contract for his personal services *outside the continental United States;* or

(3) ... *any person employed outside the continental United States* as a civilian employee paid from nonappropriated funds ...; or

(4) ... any person who is an employee specified in section 1651(a) [the Defense Base Act] ... or any person engaged under a contract for his personal services *outside the United States* ...; or

(5) ... any person employed or otherwise engaged for personal services *outside the continental United States* by an American employer providing welfare or similar services for the benefit of the Armed Forces pursuant to appropriate authorization by the Secretary of Defense.

42 U.S.C. § 1701(a) (emphasis supplied).

Thus, where Congress has intended legislation to apply extraterritorially, it has stated its intention clearly. In the ADEA, the statement of any such intention is conspicuously missing from the legislation. In fact, the only statement made as to the Act's extraterritorial reach is one which specifically incorporates a provision of the FLSA restricting the Act from applying to foreign work places. Generally, this country's labor laws have been construed to preclude extraterritorial application. *See McCulloch v. Sociedad National de Marineros de Honduras,* 372 U.S. 10, 83 S.Ct. 671, 8 L.Ed.2d 547 (1963) (National Labor Relations Act does not extend to maritime operations of foreign flag-ships); *Benz v. Compania Naviera Hidalgo,* 353 U.S. 138, 77 S.Ct. 699, 1

L.Ed.2d 709 (1957) (NLRA does not apply to foreign boat in U.S. port); *Foley Bros. Inc. v. Filardo,* 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949) (Eight Hour Law does not apply abroad); *GTE Automatic Electric, Inc.,* 226 N.L.R.B. 1222 (1976) (NLRA does not apply abroad); 29 U.S.C. § 213(f) (FLSA statutorily restricted); 29 U.S.C. § 653(a) (Occupational Safety and Health Act statutorily restricted); 40 U.S.C. § 276a (Davis-Bacon Act statutorily restricted); 41 U.S.C. § 351(a) (Service Contract Labor Standards Act statutorily restricted). In the absence of a clearly expressed congressional intention to apply the ADEA extraterritorially, *cf. Blackmer v. United States,* 284 U.S. 421, 437, 52 S.Ct. 252, 254, 76 L.Ed. 375 (1932), this court must find that our age discrimination laws are restricted to application in this country, just as other labor laws have been construed to be similarly restricted.

■ Plaintiff argues that even if the ADEA does not apply extraterritorially, this court is still barred from entering summary judgment because the decision to terminate Mr. Cleary was allegedly made in this country. Where a discriminatory act occurs here, plaintiff contends, and has a deleterious effect abroad, the employee working for the American company abroad, has a right to sue under the ADEA. This argument misses the point. Because the ADEA does not apply extraterritorially, plaintiff has no rights under the Act and therefore he has no standing to allege a violation. Where the discriminatory decision may have taken place is of no consequence.

There is no valid policy reason why this country's laws against age discrimination should not apply to American citizens employed by American companies abroad. In fact, not to apply the laws under such circumstances invites their circumvention by unscrupulous employers. For example, to deny extraterritorial effect to the age dis-

crimination laws would invite an employer to transfer an older employee to a foreign subsidiary or branch as a subterfuge and then terminate his services in violation of the statute. Furthermore, because the laws do not apply abroad, each case alleging discrimination will require a determination of the moment when the employee is deprived of the protection of the age discrimination statute. Does it cease to apply when the employee leaves for his new destination, when he arrives, or only after he remains for a specific period of time? Does it depend on whether the transfer is temporary or permanent?

It might be argued that the imposition of our age discrimination laws on companies doing business abroad would make them less competitive in hiring personnel. Potential foreign employees might not wish to be hired by a company which could be compelled to terminate their services in preference to someone whom the company is obligated to retain under the applicable United States laws. Such potential is highly speculative and probably of limited impact.

Nonetheless, we must assume that Congress, in enacting the legislation, considered these factors and determined not to provide for foreign applicability of the statute. The policy considerations which would impel this court to extend the statute's coverage have not been adopted by Congress.[5] Although the age discrimination statute is an ambitious congressional attempt to rid society of an arbitrary and injurious form of discrimination, a large void has been left. It would not be appropriate for this court to substitute its views as to what Congress should have done for what Congress actually has done.

■ For the foregoing reasons, the court will grant defendants' motion for summary judgment on the claim brought under the ADEA.[6] In addition, all pendent

---

**5.** In this case, a policy analysis to ascertain the intent of Congress, *see, e.g., Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1297–98 (3d Cir.1979), would be inappropriate because the statute itself discloses that intent.

**6.** The dismissal of the ADEA claim makes it unnecessary for the court to rule on defendants' contention that plaintiff's filing with the New York State Division on Human Rights, because it was made more than 300 days after

state law claims will be dismissed for lack of jurisdiction.[7] Attorneys for defendants are directed to submit an order consistent with this opinion.

the discriminatory act occurred, was untimely and bars this action. The court notes, however, that in analogous cases where the filing with the EEOC was timely and there was no state filing, courts have held that the proper procedure is to hold the federal action in abeyance pending the filing of a complaint with the state. *See, e.g., Oscar Mayer & Company v. Evans,* 441 U.S. 750, 764, 99 S.Ct. 2066, 2075, 60 L.Ed.2d 609 (1979); *Smith v. Joseph Schlitz Brewing Company,* 604 F.2d 220, 221 (3d Cir. 1979).

7. Plaintiff alleged a state law claim for pain and suffering. The exercise of jurisdiction over this claim would have been improper even if the

ADEA claim were permitted to proceed. *Marchetti v. Atlas Powder Co.,* 520 F.Supp. 271, 272 (E.D.Pa.1981); *Mazzare v. Burroughs Corp.,* 473 F.Supp. 234, 241 (E.D.Pa.1979).

Plaintiff also alleged that he had an agreement with defendants that American law would be incorporated into the employment relationship. In essence, plaintiff's claim is for breach of contract. Because the federal claim has been dismissed before trial, however, the court is required to decline jurisdiction over this or any other state law claim. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).