**HEALTHCARE SERVICES GROUP, INC., Plaintiff,**

v.

**ROYAL HEALTHCARE OF MIDDLESEX, LLC; and Middlesex County Improvement Authority, Defendants.**

**Middlesex County Improvement Authority, Defendant/Third Party Plaintiff,**

v.

**Surbhi Tarkas; Amjad Chowdry; and Greenwich Insurance Company, Third–Party Defendants.**

**Civ. No. 01–3223 (WHW).**

United States District Court, D. New Jersey.

Aug. 13, 2003.

**256**

Robert V. Dell'Osa, Cozen and O'Connor, Cherry Hill, NJ, for plaintiff.

Daria Anne Venezia, Venezia & Nolan, Woodbridge, NJ, for defendant/cross-claimants/third-party plaintiff.

Kenneth Hayes, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, PA, Newark, NJ, for third-party defendant/cross-claimant.

### OPINION

WALLS, District Judge.

Plaintiff Healthcare Service Group, Inc. ("HCSG" or "Plaintiff") moves for summary judgment in its breach of contract claim against defendant Middlesex County Improvement Authority ("MCIA"). Also, third-party defendant Greenwich Insurance Company ("Greenwich") moves for summary judgment against third-party plaintiff MCIA, which seeks indemnification under a performance bond issued by Greenwich. MCIA's request to submit a sur-reply brief is denied. Plaintiff's motion for summary judgment is granted; the motion of Greenwich is denied. MCIA's motion to amend the pretrial scheduling order is dismissed as moot.

### FACTS AND PROCEDURAL BACKGROUND

The Roosevelt Care Center (the "Center") is a 530–bed long-term healthcare facility located in Edison, New Jersey. MCIA owns and holds a license to operate the Center. On March 13, 2000, MCIA entered into an Agreement for Interim Management and Administration (the "Management Agreement") of the Center with Royal Healthcare of Middlesex, LLC ("Royal"). Surbhi Tarkas ("Tarkas") and Amjad Chowdry ("Chowdry") were the principals of Royal. At various times, Tarkas and Chowdry also owned, operated or managed other long-term care facilities in New Jersey. Pursuant to the Management Agreement, Royal managed, administered, operated and maintained the Center, and MCIA paid Royal operating expenses in the monthly amount of $2.3 million. Third-party defendant Greenwich issued a performance bond (the "Bond") required under the Management Agreement in the penal sum of $1 million with MCIA as obligee and Royal as principal.

On April 1, 2000, Royal entered into a Service Agreement and a Food Service Agreement (the "Service Agreements") at the Center with Plaintiff. The MCIA consented to Royal's retention of HCSG as a subcontractor. From April 1, 2000 through September 30, 2000, Plaintiff managed the housekeeping and laundry departments at the Center, and provided food services. Royal was to pay Plaintiff $114,632 per month for these services. Plaintiff also provided similar services to other long-term care facilities owned, operated or managed by Tarkas and Chow-

dry—Progressive Nursing Center; Meadowview Nursing Center; Royal Healthgate Nursing and Rehabilitation; Cliffside Health Care Center; Freehold Rehabilitation & Nursing Center; and Regal Manor Health Care Center. At the time Plaintiff negotiated the Agreements at the Center with Tarkas and Chowdry, the accounts at the other long-term care facilities were delinquent. When the Service Agreements terminated on September 30, 2000, Plaintiff requested a copy of the Management Agreement.

Plaintiff alleges that Royal failed to pay all of the invoices due under the Service Agreements at the Center. On January 9, 2001, Royal executed a promissory note (the "Note") for $342,311.52—the amount due to Plaintiff under the two agreements. The Note required payments on January 25, February 25, March 25, April 25, May 25 and June 25, 2001, with a specified interest rate of 8 percent per year, and provides for reimbursement to Plaintiff of all costs, expenses and reasonable attorneys' fees. Royal failed to make any payments under the Note and, on July 11, 2001, Plaintiff filed its complaint against Royal and MCIA seeking $342,311.52, attorneys' fees, and costs. On March 12, 2002, default judgment was entered against Royal, ordering Royal to pay Plaintiff $342,311.52, plus interest at the rate of 8 percent, along with costs, expenses, and reasonable attorneys' fees. Plaintiff now moves for summary judgment against Defendant MCIA.

On August 3, 2001, MCIA filed a cross-complaint against co-Defendant Royal, and a third-party complaint against Tarkas, Chowdry and Greenwich. Royal, Tarkas and Chowdry failed to plead or otherwise defend the third-party complaint, and default was entered against them on November 15, 2001. MCIA claims that it is entitled to recover from Greenwich under the performance bond (the "Bond") issued under the Management Agreement in the event Plaintiff obtains a judgment against MCIA. Because MCIA failed to obtain regulatory review and approval of its Management Agreement with Royal from the New Jersey Department of Health and Senior Services ("DHSS"), Greenwich argues that MCIA is not entitled to recover under the Bond. Greenwich contends that the Management Agreement effectuated a *de facto* transfer of the Center's license from the MCIA to Royal without the review and approval of DHSS. Because DHSS approval did not occur, Greenwich argues that the Management Agreement was void as against public policy and unenforceable. Thus, Greenwich's obligation under the Bond did not attach, and MCIA cannot recover as a matter of law.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. *Id.* at 248, 106 S.Ct. at 2510. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.1976), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Wahl v. Rexnord, Inc.* 624 F.2d 1169, 1181 (3d Cir.1980).

## DISCUSSION

### A. Plaintiff's Motion for Summary Judgment

HCSG managed the housekeeping and laundry departments at the Center, and provided food services. In exchange, Royal paid Plaintiff $114,632 per month. Because MCIA authorized Royal to manage, administer, operate and maintain the Center, and permitted Royal to retain subcontractors to perform these duties, HCSG insists that Royal acted with MCIA's authority when Royal hired HCSG. Both parties agree that MCIA owns the Center and holds the Certificate of Need, the license necessary to operate the Center. Consequently, MCIA is legally responsible for the Center's management and operation. MCIA reserved the right to control and direct Royal's activities at the Center, and could terminate Royal for any failure to comply with the Management Agreement. Section 2.2 of the Management Agreement reads:

> The MCIA, as the holder of the Certificate of Need, is responsible for the overall conduct of Roosevelt Care Center and compliance with all Applicable Laws. By executing this Agreement, the MCIA has engaged Royal, and Royal has accepted such engagement, to manage, administer, operate and maintain Roosevelt Care Center **as the MCIA's agent, on the MCIA's behalf and for the MCIA's account.**

Management Agreement, at § 2.2 (emphasis added). Section 9.5 further addresses the relationship of the parties:

> **Except as otherwise explicitly provided herein,** or by Applicable Laws, no party to this Agreement shall have any responsibility whatsoever with respect to services which are to be provided or contractual obligations that are to be assumed by any other party and nothing in this Agreement shall be deemed to constitute any party a partner, joint venture participant, agent or legal representative of any other party or to create any fiduciary relationship between or among the parties.

Management Agreement, at § 9.5 (emphasis added). While this section attempts to limit MCIA's liability to third-parties, the statement "Except as otherwise explicitly provided herein" serves to retain the meaning of Section 2.2, which states "MCIA has engaged Royal, and Royal has accepted such engagement, to manage, administer, operate and maintain Roosevelt Care Center **as the MCIA's agent, on the MCIA's behalf and for the MCIA's account.**" However, Section 9.18 states:

> Royal shall not subcontract any portions of the Interim Management Services required to be provided under the terms of this Agreement without the prior writ-

ten consent of the MCIA. . . . Royal shall (notwithstanding such subcontract) be fully responsible to the MCIA for all acts and omissions of its subcontractors, agents, persons or organizations engaged by Royal to furnish any services under a direct or indirect contract with Royal to the same extent that Royal is responsible for its own acts and omissions. **Nothing in this Agreement shall create or be construed to create any contractual relationship between the MCIA and any such subcontractor, agent, person or organization.**

Management Agreement, at § 9.18 (emphasis added). While Royal's decision to retain HCSG as a subcontractor was subject to the approval of MCIA, the MCIA denies that the Management Agreement created an agency relationship.

Plaintiff argues that Royal acted as MCIA's agent when Royal retained HCSG as a subcontractor and entered into the Service Agreements. When Royal failed to pay HCSG's invoices, Royal signed a Note for $342,311.52—the amount due to Plaintiff under the Service Agreements. Because Royal has failed to make any payments under the Note, and the Court has entered default judgment against Royal, HCSG seeks to recover the principal amount due and owing for its services, as well as costs, expenses and reasonable attorney's fees from MCIA.

■ HCSG seeks to hold MCIA liable for Royal's default because, at all times, Royal acted as MCIA's agent. HCSG insists that MCIA is liable as the principal for the acts of its agent. Both HCSG and MCIA agree with the central tenet of agency law: an agency relationship exists when a principal permits an agent to act on his behalf, "with the principal controlling and directing the acts of the agent." *Sears Mortgage Corp. v. Rose,* 134 N.J. 326, 337, 634 A.2d 74 (1993) (citations omit-

ted). The actual authority a principal gives to its agent may be express or implied. *Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT,* 106 F.Supp.2d 606, 617 (D.N.J.1999). Express authority specifies "minutely" what the agent may do. *Id.* (citations omitted). Implied authority permits an agent "to undertake all transactions necessary to fulfill the duties required of an agent in exercise of express authority." *Id.* (citations omitted). Absent express or implied authority, a party can be an agent based upon the apparent authority manifested by acts of the principal. *Sears Mortgage Corp.,* 134 N.J. at 338, 634 A.2d 74.

■ Plaintiff argues that the Management Agreement clearly sets forth an implied agency relationship between Royal and MCIA. By entering into the Management Agreement, Plaintiff contends that MCIA engaged Royal to manage, administer, operate and maintain the Center "as MCIA's agent," "for MCIA's account," and "on MCIA's behalf." Management Agreement, at §§ 2.1–2.3. However, MCIA argues that other provisions of the Management Agreement set forth that Royal was not MCIA's agent. Specifically, Section 9.18 states "Nothing in this Agreement shall create, or be construed to create, any contractual relationship between the MCIA and any such subcontractor, agent, person or organization." Management Agreement, at § 9.18. While the Management Agreement does not set forth Royal's duties "minutely," the Court concludes that Royal had implied authority to enter into the Service Agreements on MCIA's behalf with HCSG pursuant to the Management Agreement.

"Implied authority may arise as a necessary or reasonable implication in order to effectuate other authority expressly conferred and embraces authority to do whatever acts are incidental to, or are neces-

sary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." 3 Am.Jur.2d § 72, at 486. New Jersey's Supreme Court states that an examination of implied authority rests upon "the nature or extent of the function to be performed, the general course of conducting the business, or from particular circumstances in the case." *Sears Mortgage Corp.*, 134 N.J. at 338, 634 A.2d 74, *quoting Carlson v. Hannah*, 6 N.J. 202, 212, 78 A.2d 83 (1951).

Royal acted with MCIA's authority when it retained HCSG as a subcontractor. In the Management Agreement, MCIA authorized Royal "to manage, administer, operate, and maintain the Roosevelt Care Center," and to employ subcontractors. Management Agreement, at § 2.2, and § 2.4. Sections 9.5 and 9.18 are not relevant because HCSG asserts neither a third-party beneficiary nor a direct contract claim against MCIA. Royal's retention of HCSG as a subcontractor was within the scope of the Management Agreement, and the Court concludes that Royal had implied authority to enter into the Service Agreements with HCSG at the Center.

MCIA argues that it is not liable for Royal's default because HCSG relied on Royal's apparent authority to enter into the Service Agreements, and was utterly indifferent as to MCIA's role. In a relationship based upon apparent authority, a party may be an agent "by virtue of apparent authority based on manifestations of that authority by the principal. Of particular importance is whether a third party has relied on the agent's apparent authority to act for a principal." *Sears Mortgage Corp.*, 134 N.J. at 338, 634 A.2d 74 (citations omitted). However,

> [W]here the facts show that the third person in dealing with the putative agent is utterly indifferent to the existence of a principal, and rather indicates that the dealings are with the putative agent as a principal, no liability can be fashioned against one who later may appear by circumstance to be in a possible position of "apparent or ostensible" principal.

*N. Rothenberg & Son v. Nako*, 49 N.J.Super. 372, 382, 139 A.2d 783 (App.Div.1958) (citation omitted).

Before HCSG entered into the Service Agreements with Royal to provide food services at the Center and manage its housekeeping and laundry departments, it provided similar services to other long-term care facilities owned, operated or managed by Tarkas and Chowdry, the principals of Royal. These long-term care facilities were: Progressive Nursing Center; Meadowview Nursing Center; Royal Healthgate Nursing and Rehabilitation; Cliffside Health Care Center; Freehold Rehabilitation & Nursing Center; and Regal Manor Health Care Center (collectively, "Professional Healthcare"). In April 2000, when Plaintiff negotiated the Service Agreements at the Center with Tarkas and Chowdry, Plaintiff knew that the accounts at Progressive Nursing Center, Meadowview Nursing Center, Cliffside Healthcare Center, and Freehold Rehabilitation & Nursing Center were delinquent. Specifically, Professional Healthcare owed Plaintiff in excess of $130,000.00. Further, Plaintiff did not perform a credit background check on Royal or on Professional Healthcare before entering into the Service Agreements.

Because Plaintiff had already developed a business relationship with Tarkas, Chowdry and Professional Healthcare, MCIA argues that Plaintiff would have entered into the Service Agreements at the Center regardless of MCIA's status as Royal's principal. "Plaintiff was aware of the risk in dealing with Royal and chose to proceed

to contract with Royal notwithstanding such risk. It cannot now look to the MCIA to recover its loss." Def. Opposition Br., at 6–7. The issue of reliance would be relevant if HCSG's agency claim were based on apparent authority. The Court has already determined that the agency relationship between MCIA and Royal was based on actual authority granted in the Management Agreement, and rejects MCIA's argument.

■ MCIA also argues that the default judgment entered against Royal in Plaintiff's favor was an election of remedies, so Plaintiff is barred from seeking judgment against MCIA. The election of remedies doctrine "prohibits a party, in asserting his rights, from occupying inconsistent positions 'in relation to the facts which form the basis of his respective remedies.' The purpose of the rule is to prevent double recoveries, forum shopping, and harassment of defendants by dual proceedings." *Cleary v. U.S. Lines, Inc.*, 555 F.Supp. 1251, 1256 (D.N.J.1983) (citations omitted). Because the default judgment against Royal has not yet been satisfied, Plaintiff has not recovered anything from Royal so there is no risk of double recovery. In *Moss v. Jones*, 93 N.J.Super. 179, 225 A.2d 369 (App.Div.1966), the court said: "There may be several judgments against different persons for the same obligation or liability, so long as there is only one satisfaction or recovery." *Id.* at 184, 225 A.2d 369, *citing Pennsylvania Greyhound Lines v. Rosenthal*, 14 N.J. 372, 385, 102 A.2d 587 (1954) and *Losito v. Kruse*, 136 Ohio St. 183, 24 N.E.2d 705 (1940). Further, there is no evidence of forum shopping or dual proceedings for the purpose of harassing defendants. The Court concludes that the election of remedies doctrine does not apply: "a person injured by the negligence of an agent or servant may sue the agent or servant and the principal

or master in one suit, or may proceed against them in separate suits, and the recovery of a judgment, not satisfied, against the agent or servant does not bar a separate suit against the principal or master." *Id.* at 185, 24 N.E.2d 705.

Given the outcome of Plaintiff's motion for summary judgment, the Court dismisses as moot MCIA's motion to amend the pretrial scheduling order to identify an expert witness out of time. The Court also denies Plaintiff's request to submit a sur-reply brief in opposition to Plaintiff's motion for summary judgment.

### B. Third–Party Defendant's Motion for Summary Judgment

In New Jersey, the DHSS regulates the licensing and operation of nursing homes. A license is neither assignable nor transferable, and is "immediately void" if ownership changes. N.J.A.C. 8:39–2.4(g). DHSS reviews all transfers based on standards set forth in N.J.A.C. 8:33–4.10, and each applicant must demonstrate the ability to comply with both state and federal regulations. N.J.A.C. 8:33–4–10(d). Section 1.5 of the Management Agreement between MCIA and Royal mandated that, if required, the parties had to undertake DHSS review. Section 1.5 states in pertinent part:

> This Agreement shall take effect and the rights and obligations and liabilities of the parties hereunder shall take effect on the date that each of the conditions set forth below has been satisfied or waived by the parties (to the extent permitted by Applicable Laws):
>
> (b) If required by Applicable Laws, the terms of this Agreement (or approval of this Agreement) shall be approved by the [Department of Health and Senior Services] and any other applicable Governmental Body.

Management Agreement, at § 1.5. The Management Agreement defines "Applicable Laws" as "the Certificate of Need, the Operating Requirements and any statute, law, constitution, charter, ordinance, resolution, judgment, order, decree, rule, regulation, directive, interpretation, standard or similarly binding authority, which shall be enacted, adopted, promulgated, issued or enforced by a Governmental Body relating to Royal" the Center, or the MCIA. Management Agreement, at § 1.1. Greenwich insists that the purpose of the Management Agreement was to transfer bottomline financial responsibility as well as oversight and managerial control from MCIA to Royal. And Greenwich argues that the Management Agreement effectuated a *de facto* transfer of the Center to Royal. DHSS regulations require agency review and approval before any transfer, or the license is void. MCIA admits that no such review of the Management Agreement occurred. Without such review, Greenwich contends that the Management Agreement is void as against public policy and unenforceable, and materially increased Greenwich's risk. According to Greenwich, its obligations under the Bond never attached and the MCIA cannot recover under the Bond as a matter of law.

MCIA rejects Greenwich's argument that the Management Agreement required DHSS review. MCIA admits that the Management Agreement was the "first step" towards a lease of the Center to Royal, transfer of the license to Royal and eventual ownership by Royal. MCIA Statement of Undisputed Material Fact, at ¶ 11. However, MCIA argues that DHSS regulations do not specifically state that a management agreement such as the one between MCIA and Royal requires approval before implementation.

Greenwich relies on an earlier transaction between the MCIA and a private management firm, Solomon Health Group, LLC ("Solomon") to support its argument that the Management Agreement required DHSS review and approval. In early 1997, Middlesex County had filed an application to transfer the Center's license from the County to MCIA. The same transaction also included a management agreement between MCIA and Solomon. The DHSS approved the transfer of the license from Middlesex County to MCIA, and permitted MCIA to enter into the management agreement with Solomon. Based upon its review of the Solomon management agreement, DHSS stressed that a transfer of bottom-line financial responsibility from the license holder to another party amounted to a transfer of the license itself. As a result, DHSS required MCIA to retain full financial responsibility for the Center, and MCIA acknowledged its financial responsibilities. Apr. 24, 1997 Letter from MCIA to DHSS. In the absence of full financial responsibility, DHSS would have conducted a full review of the transaction and MCIA would have required DHSS approval because the agency considered such transactions to be a license transfer.

When the relationship between MCIA and Solomon deteriorated, the parties reached a settlement agreement in early 2000 and MCIA entered into the Management Agreement with Royal. The question remains whether MCIA transferred bottom-line financial responsibility for the Center to Royal. If so, then DHSS must review and approve the transaction because—as MCIA knew from its experience with the Solomon management agreement—DHSS considers such an arrangement to be a *de facto* transfer of the operating license. While Greenwich insists that a transfer did occur, it is not clear from the evidence before the Court whether MCIA transferred bottom-line financial responsibility to Royal.

A review of the Management Agreement suggests that MCIA retained authority over Royal during the term of the contract. While Royal employed the licensed nursing home administrator and the management staff of the Center, MCIA employed all other staff members. Management Agreement, § 2.4. Further, "Royal shall be solely responsible for the direction and supervision of all employees and Royal shall make recommendations to the MCIA as to the hiring, discipline and discharge of such employees, but the MCIA shall retain sole authority for these decisions." *Id.* Also, the Management Agreement required MCIA to pay Royal $1.15 million on the 1st and the 15th of every month. In exchange, Royal paid for the Center's normal, reasonable and customary fees and expenses such as "utilities, insurance, the costs of management personnel, accounting services, computer services, and any and all other Operating Costs." Management Agreement, at § 4.1. Yet MCIA retained responsibility for any fine or penalty incurred if Royal failed to perform these services. *Id.*

■ MCIA admits that its ultimate goal was to transfer the Center's license to Royal, and that the Management Agreement was the preliminary step towards the Center's eventual ownership by Royal. MCIA Statement of Undisputed Material Facts, at ¶ 11. However, the Court cannot now determine whether the Management Agreement essentially transferred bottom-line financial responsibility from MCIA to Royal, an act which would require DHSS review and approval. MCIA has set forth specific evidence demonstrating that it retained final authority over Royal's management of the Center. There is a genuine issue of material fact as to whether MCIA and Royal should have submitted the Management Agreement to DHSS for review and approval: Did the Management Agreement and the parties' conduct evidence a transfer of bottom-line financial responsibility? The failure of MCIA and Royal to seek review from DHSS does not necessarily now void the Management Agreement. Accordingly, the Court denies Greenwich's motion for summary judgment.

**CONCLUSION**

MCIA's request to submit a sur-reply brief is denied. Plaintiff's motion for summary judgment is granted; the motion of Greenwich is denied. MCIA's motion to amend the pretrial scheduling order is dismissed as moot.

**ORDER**

Plaintiff Healthcare Service Group, Inc. moves for summary judgment in its breach of contract claim against defendant Middlesex County Improvement Authority. Also, third-party defendant Greenwich Insurance Company moves for summary judgment against third-party plaintiff Middlesex County Improvement Authority, which seeks indemnification under a bond issued by Greenwich.

And the Court, having considered the arguments of the parties and for the reasons stated in the accompanying opinion and good cause shown, it is on this _____ day of August, 2003:

ORDERED that the request of defendant Middlesex County Improvement Authority to submit a sur-reply brief is DENIED; and it is further

ORDERED that the motion of plaintiff Healthcare Service Group, Inc. for summary judgment is hereby GRANTED; and it is further

ORDERED that the motion of Defendant Middlesex County Improvement Authority to amend the pretrial scheduling order to identify an expert witness out of

time is DISMISSED as moot; and it is further.

ORDERED that the motion of third-party defendant Greenwich Insurance Company for summary judgment is hereby DENIED; and it is further

ORDERED that trial is to commence on October 7, 2003.