**Jerry N. ZAHOUREK, Plaintiff,**

v.

**ARTHUR YOUNG & COMPANY, Defendant.**

Civ. A. No. 83–K–229.

United States District Court, D. Colorado.

July 25, 1983.

Eugene Deikman, Denver, Colo., for plaintiff.

H. Thomas Coghill, Denver, Colo., Paul J. Ostling, New York City, for defendant.

MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This is a case of first impression in this circuit: *viz.,* Does the Age Discrimination in Employment Act apply to an American citizen employed abroad by an American company? Before me is Arthur Young's motion to dismiss for failure to state a claim upon which relief can be granted. Zahourek's complaint is straightforward. He alleges that he was fired by Arthur Young in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* He also claims that Arthur Young took retaliatory action against him when he told his employer that he had filed an EEOC complaint against Arthur Young. Since both parties have relied upon matters outside the pleadings, I am treating this motion as one for summary judgment.

FACTS

Before his discharge in 1981, Zahourek, a CPA, had worked for Arthur Young for nearly ten years. He describes himself as a specialist in international consulting, in which capacity Arthur Young employed him in a variety of international settings, in-

cluding Saigon, Damascus and Cairo. From 1978–1981, Zahourek worked in San Pedro Sula and Tegucigalpa, Honduras. In August, 1980, Zahourek learned that Arthur Young intended to phase out its Central American operations. In apparent reliance on this projection, Zahourek agreed, in mid-February, to take his accrued vacation and to be placed upon leave without pay pending the execution of various proposed business contracts, the sale of his home in Honduras, and reassignment by Arthur Young.

On 6 March 1981, while passing through Florida, Zahourek telephoned Ed Bartholomew, an Arthur Young partner and supervisor of Arthur Young's international consulting division in New York. Arthur Young, according to Bartholomew, had decided to fire Zahourek because of his age and the concomitant fact that his pay scale was too high for Arthur Young's international job openings.

When terminated, Zahourek was 43 years old and a principal employee, the last rung in the partnership ladder. Arthur Young's partnership structure is such that the early forties are critical years for a would-be partner. Typically, it takes ten years to pay back the sum advanced by Arthur Young to buy into the partnership. Performance bonuses and salary increases thereafter are earmarked for retirement funds. Arthur Young, says Zahourek, is accordingly reluctant to make anyone older than 45 a partner. He alleges that even if he had been transferred to a local office, he would have had little chance to make partner, since it takes a minimum of two years to garner sufficient local support for such a move.

In March, 1981, Zahourek and Arthur Young struck a termination agreement by the terms of which he ceased active employment as of that date, took accrued vacation time, and was paid for three more months. During the termination period, Zahourek continued to work as an independent contractor for Arthur Young, in an attempt to secure a contract for Arthur Young with

COHBANA, an Honduran government agency relating to the banana industry. Zahourek remained in Honduras as an independent contractor until January, 1982, when he was terminated by Arthur Young, allegedly for filing an EEOC complaint with the New York EEOC office.

## MOTION TO DISMISS

Arthur Young advances three arguments in support of this motion. It argues that Zahourek's ADEA charge was filed more than 180 days after his termination, thus barring this suit. 29 U.S.C. § 626(d)(1). Second, Arthur Young denies the ADEA is applicable to its partnership promotion policies. Finally, it claims that the ADEA has no application to an individual who is employed in a foreign country. Since I agree with Arthur Young's last argument, I need not address the first two issues.

### 1. The Extraterritoriality of the ADEA

■ The defendant argues that the protections of the ADEA do not apply to American citizens working abroad for American companies. Arthur Young relies, in part, upon 29 U.S.C. § 626(b), which provides that the ADEA shall be enforced in accordance with the Fair Labor Standards Act. The FLSA does not apply "to any employee whose services during the workweek are performed in a workplace within a foreign country." 29 U.S.C. § 213(f).

Arthur Young also relies upon the only two district court decisions which have addressed this issue, *Osborne v. United Technologies Corp.*, 16 FEP 586 (D.C.Conn.1977), *Cleary v. United States Lines*, 555 F.Supp. 1251 (D.C.N.J.1983), 30 FEP 1361.

In *Osborne*, the employee failed to file suit timely, but claimed the 180 day limitation was tolled by his employer's failure to post the required ADEA informational notices in its Cologne, Germany offices. Judge Blumenfeld granted the employer's motion to dismiss, saying:

[a]s the regulations make explicit, though, the extraterritorial effect of the

ADEA is an extremely limited one.... [T]he prohibitions in the Act 'are considered to apply only to the performance of the described discriminatory acts in places over which the United States has sovereignty, territorial jurisdiction, or legislative control.' Cologne, Germany does not come within this territorial description. 16 FEP at 588.

In *Cleary,* the plaintiff was employed in England by a New York corporation with its principal place of business in London. When discharged at age 64, allegedly on account of his age, Cleary brought suit under the ADEA. In an exhaustive and well-reasoned opinion, Judge Sarokin determined that the ADEA does not apply to American citizens working for American companies in offices in foreign countries. Judge Sarokin explicitly recognized that:

> [t]here is no valid policy reason why this country's laws against age discrimination should not apply to American citizens employed by American companies abroad. In fact, not to apply the laws under such circumstances invites their circumvention by unscrupulous employers. 555 F.Supp. at 1263.

Zahourek urges me to decide, as a matter of policy, that the ADEA's protection applies to American citizens working abroad. He *claims* to rely upon 22 U.S.C. § 1731, which *purportedly* provides:

> (1) United States citizens living abroad should be provided fair and equitable treatment by the United States Government with regard to ... rights, and benefits; and
>
> (2) United States statutes and regulations should be designed so as not to create competitive disadvantages for individual American citizens living abroad or working in international markets.

In fact, § 1731 says nothing of the kind. Section 1731 relates to the protection of naturalized citizens abroad and provides:

> All naturalized citizens of the United States while in foreign countries are entitled to and shall receive from this government the same protection of persons and property which is accorded to native-born citizens.

The "equitable treatment" provision on which Zahourek relies is an uncodified law, drafted and sponsored by Senator George McGovern. Pub.L. No. 95–426, Title VI, § 611, October 7, 1978, 92 Stat. 989. It was first passed in 1978 and expressed the sense of congress that there *should* be equitable treatment of expatriates in such areas as "taxation, citizenship of progeny, veterans' benefits, voting rights, Social Security benefits and other obligations, rights, and benefits...." As initially passed, it required the president to identify and evaluate "all United States citizens living abroad ...," and to recommend appropriate remedial legislation.

In response to the First Presidential Report (submitted August 27, 1979), "Equitable Treatment of United States Citizens Living Abroad,"[1] Senator McGovern amended Pub.L. 95–426 to require the president to report on statutes and regulations "which may cause, directly or indirectly, competitive disadvantages for Americans working abroad relative to the treatment by other major trading nations of the world of their nationals who are working outside their territory...." Pub.L. No. 96–60, § 407, August 15, 1979, 93 Stat. 405. President Carter complied with this directive, too, submitting a Second Presidential Report on January 24, 1980.[2]

I recite this somewhat obscure legislative history only to point out that congress ap-

---

1. This report will be found in *U.S. Law Affecting Americans Living and Working Abroad, A Report to the Committee on Foreign Relations, United States Senate,* August, 1980, Government Document No. Y4.F76/2:Am3/5.

2. The Second Presidential Report will be found in the above *Committee Report* at page 23.

The Second Presidential Report focused exclusively on the tax treatment of expatriates. As President Carter put it, in his letter of transmittal: "It is clear to me that the phrase 'competitive disadvantage' refers primarily to Federal taxation." *Committee Report* at 23.

pears vitally aware of possible discrimination against Americans working abroad, not only in comparison to other Americans, but also in comparison to other foreign nationals living and working abroad. Nowhere, however, do I find a mention of the ADEA—or for that matter Title VII or the FLSA.

The first report studied in excess of 30 laws and regulations, ranging from naturalization and taxation to congressional representation for Americans abroad. Under "Employment," four areas of concern were identified: unemployment compensation, Department of Defense overseas hiring practices,[3] outside employment of Department of Defense personnel, and life insurance standards.[4]

Appendix B of the Committee Report contains a paper submitted by American Citizens Abroad, a Switzerland-based, expatriate lobbying group. The ACA paper identified 63 discriminatory provisions, some important (the naturalization of alien spouses), some picayune (the nonavailability of toll-free telephone access to IRS help when abroad). Again, nowhere is there a breath of suggestion that the ADEA should apply overseas.

Public Law 95–426, as amended, remains on the books today. It is, however, aspirational in nature, not mandatory. As such it does not provide the support Zahourek claims it does. More importantly, the very absence of the ADEA in the legislative history of the act militates against extending its protection to plaintiffs such as Zahourek.

As suggested by the *Cleary* opinion, there are at least four reasons to believe that congress intended a territorial application of the ADEA. First, the ADEA specifically incorporates the enforcement provisions of the FLSA, which is explicitly restricted to this country. 555 F.Supp. at 1258, 1259. Second, it would be anomalous to permit the extraterritorial application of the act, and at the same time not empower or structure the EEOC investigatory apparatus to function abroad. *Id.* at 1259, 1260. Third, accepting for the moment Zahourek's claim that Title VII is a more appropriate model than the FLSA, the ADEA contains no language from which a "negative inference" can be drawn that congress intended the ADEA to apply extraterritorially.[5] *Id.* at 1261, 1262. Finally, *Cleary* points out that congress could have provided for specific extraterritorial application of the ADEA, as it did in the Defense Base Act, 42 U.S.C. § 1651 et seq., and the War Hazards Compensation Act, 42 U.S.C. § 1701(a). This congress did not do,[6] and I am loathe to tread on its exclusive law-making domain. Accordingly, I conclude that the ADEA does not apply to an American citizen employed abroad by an American company.

 I now must decide when and if Zahourek was

> deprived of the protection of the age discrimination statute. Does it cease to apply when the employee leaves for his new destination, when he arrives, or only after he remains for a specific period of time? Does it depend on whether the transfer is temporary or permanent? 555 F.Supp. 1263.

---

**3.** See *Weinberger v. Rossi,* 456 U.S. 25, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982).

**4.** *Committee Report* at 14–17.

**5.** For the "negative inference" as a basis of extraterritorial jurisdiction, *see Bryant v. International School Services, Inc.,* 502 F.Supp. 472 (D.C.N.J.1980), *rev'd on other grounds,* 675 F.2d 562 (3rd Cir.1982); *Love v. Pullman Co.,* 11 E.P.D. ¶ 10,858, 13 F.E.P. 423, (D.C.Colo. 1976).

**6.** "The term 'State' includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act." 29 U.S.C. § 630(i). *See also* 29 C.F.R. § 850.20. "The prohibitions in section 4 of the Act are considered to apply only to performance of the described discriminatory acts in places over which the United States has sovereignty, territorial jurisdiction or legislative control."

Before his transfer to Hondouras, Zahourek had been employed almost exclusively outside the United States. He worked in Honduras for three years before being terminated. He was clearly employed there. When informed that he was being terminated because of his age, however, Zahourek was in Florida, returning to Honduras from a business trip in Indonesia.

He argues that the ADEA applies in this case because the age discrimination concerned employment for him in the United States, since Arthur Young refused to retain him or transfer him to a local American office. I find, however, that the discriminatory effect was on Zahourek's place of employment—Honduras, and as such, the ADEA does not apply to him. I realize that my analysis does not resolve the issues raised by *Cleary* as to when the ADEA's protections cease to apply, but those are issues I need not address here. Where the plaintiff is employed in a foreign country, as Zahourek was, the ADEA does not provide him protection from invidious discrimination on account of age. The defendant's motion to dismiss is therefore granted.