Ali BOURESLAN, Plaintiff–Appellant,

v.

ARAMCO, ARABIAN AMERICAN OIL
CO. and Aramco Service Company,
Defendants–Appellees.

No. 87–2206.

United States Court of Appeals,
Fifth Circuit.

Feb. 2, 1990.

**1272**

James Field Tyson, Neal H. Paster, Houston, Tex., for plaintiff-appellant.

Charles A. Shanor, Vincent J. Blackwood, Karen MacRae Smith, E.E.O.C., Washington, D.C., for intervenor E.E.O.C.

Edward E. Potter, Samuel A. Marcosson, Washington, D.C., amicus curiae, for E.E.O.C.

John D. Roady, Linda Ottinger Headley, Hutcheson & Grundy, Houston, Tex., for Aramco.

Lawrence Z. Lorber, John E. Parauda, Breed, Abbott & Morgan, Washington, D.C., for amicus curiae ASPA.

Cecil J. Olmstead, Steptoe & Johnson, Washington, D.C., for amicus curiae Rule of Law Committee.

Pamela S. Karlan, Univ. of Va., School of Law, Charlottesville, Va., for amicus curiae NAACP.

Michael M. Mulder, Thomas R. Meites Bartley F. Goldberg, Chicago, Ill., for amicus curiae Wm. Ozolin, et al.

Before CLARK, Chief Judge, GEE, REAVLEY, POLITZ, KING, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH and DUHÉ, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

We sit en banc in this case to consider a single question: whether Title VII regulates the employment practices of U.S. employers which employ U.S. citizens outside the United States. We affirm the district court's order dismissing this suit.

## I.

In his Title VII suit, Boureslan charged that while he was working in Saudi Arabia his employer, Arabian American Oil Co. (Aramco), discriminated against him because of his race, religion and national origin. Aramco's motion to dismiss for lack of jurisdiction squarely raised the question whether Title VII's protection extends to U.S. citizens employed abroad by U.S. employers.

We answer this question in the negative as did the district court and the panel majority. *See Boureslan v. Aramco*, 857 F.2d 1014 (5th Cir.1988). In reaching this conclusion we adopt the reasoning of the panel majority. We write briefly to summarize the reasons for our conclusion and to include two points that were more fully developed during en banc briefing and argument.

## II.

### A.

The respect for the right of nations to regulate conduct within their own borders is a fundamental concept of sovereignty that is not lightly tossed aside. *See American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 356, 29 S.Ct. 511, 512, 53 L.Ed. 826 (1909); *Blackmer v. United States*, 284 U.S. 421, 437, 52 S.Ct. 252, 254, 76 L.Ed. 375 (1932). From this concept the established presumption against extraterritorial application of a statute developed. *Id.* The critical question that governs this appeal is whether Congress included language in Title VII that reflects a clear congressional intent to overcome the presumption against extraterritorial application of the Act.

The Supreme Court described this presumption in *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949), a case closely analogous to the case at hand. In that case, Filardo, a U.S. citizen, argued that the Federal Eight Hour Law entitled him to overtime

pay for work he had performed while in the employ of Foley Brothers, a U.S. government contractor operating in Iran and Iraq. The Court, in rejecting Filardo's claim, explained the nature of the presumption against extraterritorial application of a statute:

> The canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States ... is a valid approach whereby unexpressed congressional intent may be ascertained. It is based on the assumption that Congress is primarily concerned with domestic conditions. We find nothing in the Act itself ... nor in the legislative history, which would lead to the belief that Congress entertained any intention other than the normal one in this case.

*Id.* The Court's scrutiny of the Eight Hour Law's statutory language and structure revealed no congressional intent to cover workers such as Filardo—a conclusion bolstered by the legislative history's focus on domestic wage and unemployment problems. *Id.* at 285–87, 69 S.Ct. at 577–78. In examining this statute, the Supreme Court set out the standard by which we must measure Boureslan's arguments: "An intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a *clearly expressed purpose.*" *Id.* at 286, 69 S.Ct. at 578 (emphasis added).

### B.

Boureslan's argument that Title VII reflects a clear congressional intent to extend its reach outside this country chiefly rests on Title VII's alien exemption provision, 42 U.S.C. § 2000e–1. This provision which expressly establishes an exemption from coverage under the Act provides: "This title shall not apply to an employer with respect to employment of aliens outside of any state." Boureslan finds the necessary clear expression of congressional intent to apply Title VII abroad by drawing a negative inference from that provision and concluding that Congress meant to *include*

citizens working abroad when it excluded aliens abroad. We disagree, and for the reasons that follow conclude that this single negative inference falls short of the required clear expression of congressional intent necessary to extend the reach of the Act outside this country.

### 1.

Boureslan argues first that if we do not attach his negative inference to the alien exemption provision, we strip the provision of all purpose. This is simply not accurate. As we noted in the panel opinion, "no one disputes that the provision excludes coverage to aliens employed outside the states." *Boureslan,* 857 F.2d at 1018. Also the Supreme Court in *Espinoza v. Farrah Mfg. Co.,* 414 U.S. 86, 95, 94 S.Ct. 334, 340, 38 L.Ed.2d 287 (1973), determined that this provision reflects a congressional intent to provide Title VII coverage to aliens employed *within* the United States. Thus, we remain persuaded that we need not choose to either attach Boureslan's negative inference to this provision or strip the provision of all meaning. Even if we decline to give the alien exemption provision the interpretation appellant seeks, the provision is still a meaningful and useful part of the Act.

### 2.

The domestic focus of the Act is also inconsistent with an intent to give extraterritorial reach to it. As noted in the panel opinion, Boureslan's effort to read an international reach into Title VII's general policy statements and alien exemption provision fails in light of repeated references in the Civil Rights Act of 1964 to "United States", "states" and "state proceedings." *See Boureslan,* 857 F.2d at 1019.

In Title VII itself, Congress specifically accommodated state employment discrimination proceedings in an effort to avoid conflicts with state law and recognized state interests. *See* 42 U.S.C. §§ 2000e–5(c), (d), (e). If Congress had intended the Act to apply in foreign countries, we would expect Congress to have been even more careful to address conflicts with foreign discrimination laws. Yet the statute says

nothing about potential conflicts with foreign discrimination laws.

### 3.

The Act is also curiously silent in a number of areas where Congress ordinarily speaks if it wants to extend its legislation beyond our borders. First, the Act fails to address venue problems that arise with foreign violations. *Cf.* 42 U.S.C. § 2000e–5(f)(3) (establishing venue "in any judicial district in the State in which the unlawful employment practice is alleged to have been committed...."). Next, the Equal Employment Opportunity Council's investigatory powers are limited to evidence obtained in the United States and its territories. 42 U.S.C. § 2000e–9.

Finally, if we give extraterritorial reach to Title VII, the plain language of the Act would necessarily extend that title to govern the employment relationship between foreign employers, and their American employees anywhere in the world. See § 2000e(b). We say this because nothing in the Act exempts foreign employers and our courts have held that foreign employers engaged in commerce in the United States are employers under Title VII. *See, e.g., Spiess v. C. Itoh & Co. (America), Inc.,* 643 F.2d 353 (5th Cir.1981). We doubt that Congress ever intended to impose Title VII on a foreign employer who had the grace to employ an American citizen in its own country.

### 4.

As the Court stated as recently as January 1989, when it desires to do so, Congress knows how to give extraterritorial effect to one of its statutes. *Argentine Republic v. Amerada Hess Shipping Co.,* —— U.S. ——, 109 S.Ct. 683, 691, 102 L.Ed.2d 818, 832 (1989). A good example is the Age Discrimination and Employment Act which was amended in 1984 to give the Act extraterritorial application. 29 U.S.C. § 630(f) ("The term 'employee' includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country."). *See also* The Comprehensive Anti–Apartheid Act of 1986, 22 U.S.C. §§ 5001–5116 (1979, Supp. 1989); The Export Administration Act, 50 U.S.C. app. §§ 2401–2420 (Supp.1989). Congress demonstrated in the above acts its awareness of the need to make a clear statement of extraterritorial application, address the concerns of conflicting foreign law, and provide the usual nuts-and-bolts provisions for enforcing those rights.

### C.

In essence, Boureslan asks this court to conclude that Congress balanced Title VII's important goals against the foreign sovereignty concerns that underlie the presumption against extraterritoriality, considered the implications of application abroad and then addressed these concerns by inviting courts to read between the lines. For the reasons stated above, we cannot accept this conclusion and hold that Title VII does not reflect the necessary clear expression of congressional intent to extend its reach beyond our borders.

AFFIRMED.

KING, Circuit Judge, with whom REAVLEY, POLITZ, JOHNSON and WILLIAMS, Circuit Judges, join dissenting:

I agree with the majority that the sole question presented in this en banc rehearing is whether Congress acted to extend the protections of Title VII to United States citizens employed in other countries by United States employers. I believe that a fair and reasonable reading of this civil rights statute compels the conclusion that Congress did, in fact, intend Title VII's broad remedial goals to encompass, and eradicate, an American employer's discriminatory employment practices against a United States citizen, even if the acts constituting such discrimination were carried out on foreign soil. Therefore, I must respectfully dissent from the majority's holding, which has affirmed the district court's dismissal of appellant Boureslan's action.

### The Alien Exemption Clause

It is undisputed that Congress has the power to extend the protection of its laws

extraterritorially when it is regulating the conduct of United States nationals. *See, e.g., Steele v. Bulova Watch Co.,* 344 U.S. 280, 282–83, 73 S.Ct. 252, 253, 97 L.Ed. 319 (1952); *United States v. Mitchell,* 553 F.2d 996, 1001 (5th Cir.1977). In determining whether Congress intended to exercise this power when it enacted Title VII, we are guided by a presumption that acts of Congress are intended to apply only within the territory of the United States unless there is a clear expression of congressional intent to the contrary. *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949); *Mitchell,* 553 F.2d at 1002.[1]

A clear expression of Congress's intent regarding the extraterritorial reach of Title VII is found in section 702 of the statute, the alien exemption clause. 42 U.S.C. § 2000e–1. This section provides that Title VII "shall not apply to an employer with respect to the employment of aliens outside any State." *Id.* If Congress had not envisioned an extraterritorial application of Title VII, a specific provision exempting only aliens from such coverage would not have been needed. Likewise, if Congress had intended in section 702 to explicitly reject extraterritorial application, it would have used one of the statute's general terms: "individuals" or "employees." *See, e.g.,* 42 U.S.C. § 2000e–2 (prohibiting discrimination against "any individual" with respect to his or her employment). *Compare* Fair Labor Standards Act, 29 U.S.C. § 213(f) (excluding from FLSA coverage "any employee" whose services are performed in a foreign country). Canons of statutory construction require that we interpret a statute "to give effect, if possible, to every

word Congress used." *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *see also Argentine Republic v. Amerada Hess Shipping Corp.,* —— U.S. ——, 109 S.Ct. 683, 691, 102 L.Ed.2d 818 (1989) (refusing to construe statute to render its terms nugatory); *Beisler v. Commissioner,* 814 F.2d 1304, 1307 (9th Cir.1987) ("We should avoid an interpretation of the statute that renders any part of it superfluous and does not give effect to all of the words used by Congress."). The logical and necessary interpretation of section 702 is that, by specifically providing an exemption for employers regarding the extraterritorial employment of "aliens," without providing a similar exemption as to the corresponding category of "citizens," Congress intended that American employees would be covered under Title VII.

In response to this common-sense interpretation of section 702, the majority relies on two alternative interpretations. First, the majority suggests that the alien exemption provision means simply that aliens employed outside the United States are not covered by Title VII. I do not contend, of course, that section 702 does not mean what it says. However, such a narrow reading of Congress's language, although superficially appealing, is unreasonable because it renders the provision purposeless: if no individual was intended to be covered extraterritorially by Title VII, a specific provision excluding only aliens would be superfluous.

Next, the majority points to a parallel inference that one may draw from section 702: that aliens employed *within* the Unit-

---

1. There is a second, and distinct, presumption that Congress does not intend to violate international law. A statute may not be construed to violate international law unless Congress has, by an "affirmative expression" of its intent, required such a construction. *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21–22, 83 S.Ct. 671, 677, 9 L.Ed.2d 547 (1963); *Weinberger v. Rossi,* 456 U.S. 25, 32, 102 S.Ct. 1510, 1516, 71 L.Ed.2d 715 (1982). As I explained in considerable detail in my panel dissent, extraterritorial application of Title VII under the circumstances before us would not violate international law; therefore, this presumption does not apply in the instant case.

*See Boureslan,* 857 F.2d at 1021–31 (King, J., dissenting).

The less stringent standard of the presumption against extraterritorial application of a federal statute does not require an explicit, affirmative statement of Congress. Instead, the Supreme Court has said that the presumption "is a valid means whereby *unexpressed* congressional intent may be ascertained." *Foley Bros.,* 336 U.S. at 285, 69 S.Ct. at 577 (emphasis added). The question involved in our determination is what showing of congressional intent is sufficiently clear to overcome the presumption against extraterritorial application.

ed States *are* covered by the Act. While this inference also follows logically from the language of the statute, it is in itself redundant because use of the term "individual" in defining "employee" is sufficient to bring aliens residing in the United States within the statute's coverage. 42 U.S.C. § 2000e(f). *See Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 95, 94 S.Ct. 334, 340, 38 L.Ed.2d 287 (1973). Indeed, Congress could not have provided otherwise without violating the equal protection principles implicit in the fifth amendment. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Moreover, if Congress's sole purpose in the alien exemption clause was to *provide* coverage to aliens residing in the United States, the more logical location in the statute to express this intent would have been the definition section, where Congress defined "employee," *see* 42 U.S.C. § 2000e(f), not the provision entitled "Exemption," where Congress provided for the limited exceptions to the broad remedial goals of Title VII.[2]

The majority opinion cites *Espinoza* apparently for the proposition that a negative inference that aliens within the United States are covered under Title VII is the "correct" interpretation of Congress's intent in enacting section 702. The plaintiff in *Espinoza* was a Mexican citizen residing in the United States. Explaining that Title VII protects resident aliens against illegal discrimination, the Supreme Court noted that congressional intent on this matter could be derived through a negative inference from section 702. *Espinoza,* 414 U.S.

at 95, 94 S.Ct. at 340. Not faced with the question of extraterritorial application, the Court had no need to discuss the mirror inference that is reflected in section 702, although the Court's rationale regarding statutory interpretation supports the derivation of such a legitimate inference. Moreover, the Court pointed out that Congress's intent in Title VII to include aliens could also be derived from its use of the term "any individual" in section 703, *id.,* supporting my point that section 702 would be redundant if the *Espinoza* inference were the only reason for its existence. Thus, the inference that the Supreme Court drew from section 702 in *Espinoza* does not preclude, but rather supports, the equally permissible—and, in fact, more reasonable—inference that Congress intended Title VII to protect United States citizens employed outside the United States.

Although the legislative history of section 702 is not remarkably illuminating, I have found nothing in the published records that contradicts my interpretation of the provision's extraterritorial language. Rather, it seems clear that section 702 is a "limited exemption" for employers and that "the intent of the [alien] exemption is *to remove conflicts of law which might otherwise exist* between the United States and a foreign nation in the employment of aliens outside the United States by an American enterprise." *Civil Rights: Hearings on H.R. 7152 Before the House Committee on the Judiciary,* 88th Cong., 1st Sess. 2303 (1963) (testimony of Representative Roosevelt explaining provisions of H.R. 405, which was incorporated into Title VII of H.R. 7152) (emphasis added).[3]

---

**2.** As a matter of statutory construction, *every part* of the statute is to be considered, including subheadings that Congress has placed on the various sections, to arrive at the statute's clear and total meaning. *House v. Commissioner,* 453 F.2d 982, 987 (5th Cir.1972); *see also Hardin v. City Title & Escrow Co.,* 797 F.2d 1037, 1039 (D.C.Cir.1986) (a descriptive subtitle that was part of an act as written by Congress constitutes an indication of congressional intent) (unanimous opinion of Judges MacKinnon, Bork, and Scalia).

**3.** The context of this legislative history is explained in my panel dissent, 857 F.2d at 1032 n. 26. Arguing that we may not "substitute legisla-

tive history for the language of the Act," the panel majority dismissed this "snippet" of legislative history as insignificant. *Id.* at 1018, 1020. Contrary to the majority's characterization of my position, I am not attempting to rely on legislative history to compensate for a lack of statutory language. As explained in this dissenting opinion, I believe the only reasonable interpretation of the plain language of section 702 is that Congress intended an extraterritorial scope for Title VII as between United States citizens and United States employers who are otherwise covered under the Act. In other words, an "exemption" must necessarily be an exemption *from* coverage that all individuals covered un-

If Title VII was not intended to apply extraterritorially, Congress would not have been concerned with conflicts of law "which might otherwise exist." [4]

Section 702 obviously reflects Congress's concern that the extraterritorial coverage of aliens under Title VII would infringe the sovereignty of other nations, in that the United States would be imposing its laws on foreign nationals working outside the United States. The effect on foreign jurisdictional sovereignty is far less pronounced, and in some cases could be negligible, when extraterritorial application of Title VII is limited to cases involving United States citizens employed by "American enterprises." This relationship reflects an area where concerns for international sovereignty, comity, and conflicts of law—concerns that explain the alien exemption provision—are outweighed by Congress's commitment in Title VII to protect the personal right of all individuals to equal employment opportunities.[5] *See Boureslan,* 857 F.2d at 1028–30 (King, J., dissenting).

An interpretation of section 702 that extends coverage of Title VII to citizens employed by United States employers in other countries, while denying such coverage to aliens, is supported by the Supreme Court's statutory analysis in *Foley Bros.,* where the Court interpreted another federal statute, the Eight Hour Law, to provide only domestic coverage. 336 U.S. at 285, 69 S.Ct. at 577. The majority cites *Foley Bros.* as a "closely analogous" case to illustrate the presumption against extraterritorial application of a federal statute.[6] A more careful analysis of *Foley Bros.* indicates, however, that the Court found in that case that the Eight Hour Law, as opposed to Title VII, contained no language that gave any indication of a congressional purpose to extend the law's coverage extraterritorially. The Court relied heavily on

---

der section 703 would otherwise enjoy. The legislative history in this case simply serves to establish that Congress did not mistakenly or clumsily include language in the statute that is superfluous or nonsensical.

4. The administrative interpretation of Title VII also supports its extraterritorial application. Intervenor-appellant, the Equal Employment Opportunity Commission ("EEOC"), the administrative agency charged by Congress with the responsibility for interpreting and enforcing Title VII, has adopted the position that Title VII applies to American citizens employed by United States firms outside the United States. *See, e.g.,* EEOC Dec. No. 85–16, 2 Empl.Prac.Guide (CCH) ¶ 6857, at 7070–75 (Sept. 16, 1985); Letter from William A. Carey, EEOC General Counsel, to Sen. Frank Church (Mar. 14, 1975), *reprinted in* Note, *Civil Rights, Employment and the Multinational Corporations,* 10 Cornell Int'l L.J. 87, 102–03 (1976) ("If Section 702 is to have any meaning at all, ... it is necessary to construe it as expressing a Congressional intent to extend the coverage of Title VII to include employment conditions of citizens in overseas operations of domestic corporations at the same time it excludes aliens of the domestic corporation from the operation of the statute.").

Likewise, the Department of Justice has taken the position that the statute applies extraterritorially. In 1975 during legislative debates over a proposed prohibition on participation in foreign boycotts requiring religion-based employment discrimination, then-Assistant Attorney General Antonin Scalia testified that Title VII already applied to the employment of United States citizens by covered employers anywhere in the world. *See Discriminatory Arab Pressure on U.S. Business: Hearings Before the Subcomm. on International Trade and Commerce of the House Comm. on International Relations,* 94th Cong., 1st Sess. 88 (1975) (statement of Antonin Scalia, Assistant Attorney General), *quoted in* Note, *Equal Employment Opportunity for Americans Abroad,* 62 N.Y.U.L.Rev. 1288, 1291 (1987).

5. Congress explained that Title VII was necessary:

> to remove obstructions to the free flow of interstate and foreign commerce and to insure the complete and full enjoyment by all persons of the rights, privileges, and immunities secured and protected by the Constitution.

House Report on Civil Rights Act of 1964, H.R. Rep. No. 914, 88th Cong., 1st Sess., *reprinted in* 1964 U.S.Code Cong. & Ad.News 2391, 2402.

6. I disagree that a statute such as the Eight Hour Law is "closely analogous" to Title VII. Labor laws regulating economic conditions of employment or labor-management relations involve different legislative policies—more distinctly domestic policies—and create greater risks of insulting the sovereignty of a foreign nation than does a civil rights statute such as Title VII, which reflects the more universal concerns for individual rights and liberties. *See generally* Note, *Title VII of the Civil Rights Act of 1964 and the Multinational Enterprise,* 73 Geo. L.J. 1465, 1480–83 (1985); *see also* Dehner, *Multinational Enterprise and Racial Non–Discrimination: U.S. Enforcement of an International Human Right,* 15 Harv.Int'l L.J. 71, 91–94, 100 (1974).

the fact that the statute drew no distinction between citizens and aliens. An extraterritorial application, therefore, would necessarily involve foreign national laborers, thereby creating a risk that the United States would intrude upon an area of "local concern" to foreign nations.[7] The Court explained:

> No distinction is drawn between laborers who are aliens and those who are citizens of the United States. Unless we were to read such a distinction into the statute we should be forced to conclude, under respondent's reasoning, that Congress intended to regulate the working hours of a citizen of Iran who chanced to be employed on a public work of the United States in that foreign land.... The absence of any distinction between citizen and alien labor indicates to us that the statute was intended to apply only to those places where the labor conditions of both citizen and alien employees are a probable concern of Congress. Such places do not include foreign countries such as Iraq and Iran.

*Id.* at 286, 69 S.Ct. at 578.

By explicitly exempting aliens employed abroad from the scope of Title VII, Congress addressed the factor that the Supreme Court had identified as most likely to violate principles of foreign sovereignty in the extraterritorial application of United States labor laws. I find it compelling that Title VII's alien exemption provision is derived from a fair employment bill that first appeared in April of 1949, H.R. 4453, 81st Cong., 1st Sess., only a few weeks after the Supreme Court's decision in *Foley Bros.*, and that the purpose ascribed to the exemption by the House Committee on Education and Labor some 14 years later tracks the rationale of the *Foley Bros.*

decision. *Civil Rights: Hearings on H.R. 7152 Before the House Committee on the Judiciary*, 88th Cong., 1st Sess. 2303 (1963).

Appellee Aramco's broad assertion that no other United States labor law has been construed to apply abroad ignores the fact that no other labor law has contained a specific provision that addressed the concern raised in *Foley Bros.* Only Title VII provides an exemption from extraterritorial application based on nationality. Moreover, in light of the 1984 amendment to the Age Discrimination in Employment Act,[8] 29 U.S.C. § 621 *et seq.*, ("ADEA"), it cannot be maintained that Congress has consistently declined to protect the rights of American workers employed abroad, or that such protection does not comport with federal policies.

### Title VII "Nuts and Bolts"

Although failing to point to any statutory provisions that would preclude extraterritorial application of Title VII, the majority argues that the "focus" and the "nuts and bolts" provisions of the Act are "inconsistent" with a congressional intent to provide extraterritorial coverage to United States citizens. Looking first to the domestic focus of Title VII, I agree with the majority that the Act and its legislative history make several references to problems of employment discrimination within the United States and to state laws governing employment practices. Such references are not inconsistent with the exercise of extraterritorial jurisdiction based on nationality. The impetus for Congress to enact Title VII, as is true for most federal legislation, was to remedy a perceived domestic problem. Congress's intent to apply the

---

**7.** The majority quotes the following language from *Foley Bros.*: "An intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose." 336 U.S. at 286, 69 S.Ct. at 578. In this quoted passage, the labor conditions of "primary concern" to foreign nations refers to the employment of *aliens* by United States enterprises abroad—the very concern eliminated by the alien exemption provision in Title VII. The Supreme Court does not imply in *Foley Bros.*

—and it is disingenuous of the majority to suggest—that the labor conditions of United States citizens employed abroad by United States corporations are "the primary concern of a foreign country."

**8.** *See* 29 U.S.C. § 630(f) ("The term 'employee' includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country.").

statute extraterritorially is a separate issue, and is clearly evidenced in the alien exemption provision. In addition, as I noted in my panel dissent, the effects of employment discrimination suffered by United States citizens while employed in other countries by United States employers are sufficiently pervasive to be felt in this country. *Boureslan,* 857 F.2d at 1027. I also noted that Congress was not concerned solely with the domestic effects of discrimination, but also with the image of the United States in the international community. *Id.* at 1027–28.

The geographic references in Title VII that relate to the Commerce Clause apply to limit the scope of the term "employer" to those engaged in an industry affecting commerce as that term is defined in the statute. *See* 42 U.S.C. § 2000e. However, this traditional Commerce Clause language does not by itself evidence an intent to restrict the geographic scope of the statute, but rather serves as a "nexus" requirement, providing a basis for Congress's exercise of power under the Commerce Clause. When Congress amended the ADEA in 1984 to provide explicitly for extraterritorial application, it did not alter the virtually identical Commerce Clause language found in that statute. *See* 29 U.S.C. § 630. Rather, it exempted foreign employers not controlled by United States employers. Thus, Congress clearly does not view the Commerce Clause language as a geographic restriction on the scope of an employment discrimination statute.

The majority also argues that Congress could not have intended Title VII to apply extraterritorially because Congress failed to exempt foreign employers that hire United States citizens. It is true that the amendments to the ADEA addressed this concern [9] and that an attempt to apply the

statute to foreign corporations employing United States citizens abroad could offend the sovereignty of other nations. The legislative history explaining the alien exemption provision of Title VII refers explicitly, however, to "an American enterprise." It follows that Congress intended Title VII to apply extraterritorially only to American employers. However, even if the Commerce Clause language to which the majority refers, 29 U.S.C. § 2000e(b), is the only limitation on "employers" subject to the statute's extraterritorial application, Congress has elsewhere provided an equal or broader jurisdictional grant in a statute and left to the courts the task of applying Commerce Clause analysis and principles of international law to determine whether there is an adequate basis for the exercise of jurisdiction over the acts of a particular defendant occurring outside the territory of the United States. *See, e.g., American Rice, Inc. v. Arkansas Rice Growers Cooperative Ass'n,* 701 F.2d 408 (5th Cir.1983) (Lanham Act); *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909 (D.C.Cir.1984) (Sherman Act).[10]

The majority next points to Title VII enforcement provisions relating to state law conflicts, *see* 42 U.S.C. §§ 2000e–5(c), (d), (e), arguing that "[i]f Congress had intended the Act to apply in foreign countries, we would expect Congress to have been even more careful to address conflicts with foreign discrimination laws." Looking again to the amended ADEA, which contains a similar federal-state relationship clause, 29 U.S.C. § 633, I note that Congress saw no need to add a provision addressing conflicts with overlapping foreign laws that prohibit discrimination in employment when Congress provided for the ADEA's extraterritorial scope. Congress

---

9. *See* Age Discrimination in Employment Act, 29 U.S.C. § 623(g)(2) ("The prohibitions of this section shall not apply where the employer is a foreign person not controlled by an American employer."). This provision was apparently added on the suggestion of the EEOC. *See Age Discrimination and Overseas Americans, 1983: Hearing Before the Subcomm. on Aging of the Senate Comm. on Labor and Human Resources,* 98th Cong., 1st Sess. 5 (1983).

10. In most cases, a court would probably find no jurisdiction over a foreign employer's extraterritorial practices, or would decline to exercise jurisdiction, based on the same principles of international law discussed in my panel dissent. *See Boureslan,* 857 F.2d at 1025–31. The only question before this en banc court, however, is whether Title VII's protections apply to a United States citizen employed abroad by an American employer.

did, however, amend the ADEA's "BFOQ" provision, specifying that actions otherwise prohibited under the Act shall not be unlawful if compliance with the ADEA's provisions "would cause such employer, or a corporation controlled by such employer, to violate the laws of the country in which such workplace is located." 29 U.S.C. § 623(f)(1). This circuit has already interpreted the BFOQ provision of Title VII in this fashion. *Kern v. Dynalectron Corp.*, 577 F.Supp. 1196 (N.D.Tex.1983) (assuming without addressing the extraterritorial coverage of Title VII), *aff'd on basis of district court opinion,* 746 F.2d 810 (5th Cir. 1984).[11]

The majority finds it curious that Congress made no special provisions in Title VII either for the venue of cases arising from extraterritorial violations or for the investigatory powers of the Equal Employment Opportunity Commission ("EEOC") in such cases. First, Title VII provides for venue not only in the district in which the violation was committed, but also in either the district where relevant employment records are administered, or the district where the aggrieved employee would have worked but for the unlawful employment practice. 42 U.S.C. § 2000e–5(f)(3). Venue in one of the latter two districts would usually be available in the situation—certainly not uncommon—involving the temporary foreign assignment of an employee advancing on the corporate track of an American multinational corporation. In addition, Title VII provides that if an employer is not "found" within any of the first three specified districts, venue is proper "in the judicial district in which the respondent has his principal office." *Id.* An American enterprise will generally have a principal office in the United States.[12]

Second, the geographical limitations on the EEOC's investigative powers—in both the original Act and in the 1972 amendments—apply only to the EEOC's power to *compel* compliance with administrative procedures. *See* 42 U.S.C. § 2000e–9 (incorporating 29 U.S.C. § 161, which allows the EEOC to compel the appearance of witnesses and the production of documents from anywhere within the United States or its territories). There is nothing in Title VII that precludes the EEOC from attempting to obtain the employer's voluntary cooperation in investigation and conciliation efforts.[13] It would be reasonable for Congress to conclude that United States citizens are entitled to the protections of Title VII abroad, but to decline to authorize the EEOC to expend the time or resources necessary to compel compliance with an investigation of a case in which documents and witnesses are located in other countries. Furthermore, American enterprises likely maintain records in their home offices as well as abroad, or exercise sufficient control over their foreign operations to request the production of witnesses and documents through internal channels. Thus, the EEOC clearly has the power to subpoena the home office for evidence necessary to an investigation.

The majority finally cites the ADEA as a good example for the proposition that Congress knows how to give extraterritorial effect to a statute when it desires to do so. What the majority fails to mention is that at the time Congress amended the ADEA, courts had consistently held that the ADEA did not apply extraterritorially. *See*

---

**11.** In *Kern*, a United States helicopter company required all its pilots who flew from Jeddah to Mecca, Saudi Arabia, to be Moslem. The defendant company argued that religion was a bona fide occupational qualification because Saudi law prohibited non-Moslems from entering the holy area of Mecca under penalty of death. We affirmed the district court's finding that the employer had not violated Title VII.

**12.** It is not necessary for purposes of this appeal to delineate the circumstances under which an American parent corporation will exercise sufficient control over its foreign subsidiary so that

the enterprise will constitute an American employer.

**13.** The ADEA, unlike Title VII, incorporates the enforcement provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* Under the relevant provision in the ADEA, the EEOC's enforcement powers extend *only* to cooperation with state agencies and voluntary conciliation attempts. *See* 29 U.S.C. § 626. Congress left the EEOC enforcement provisions of the ADEA unchanged when it explicitly provided for extraterritorial application of the ADEA in 1984.

*e.g., Cleary v. United States Lines, Inc.,* 728 F.2d 607 (3d Cir.1984); *Zahourek v. Arthur Young & Co.,* 567 F.Supp. 1453 (D.Colo.1983), *aff'd,* 750 F.2d 827 (10th Cir. 1984). These cases had distinguished the ADEA from Title VII because the ADEA incorporates the geographic restrictions of the Fair Labor Standards Act,[14] which Title VII does not, and contains no alien exemption clause such as is found in section 702 of Title VII. *See Cleary,* 728 F.2d at 609; *Zahourek,* 567 F.Supp. at 1456; *see also Pfeiffer v. Wm. Wrigley Jr., Co.,* 755 F.2d 554, 559 (7th Cir.1985). Every court previously faced with the issue of Title VII's scope either had concluded that the alien exemption provision evidenced an intent to apply the Act extraterritorially, or had simply assumed jurisdiction without discussion. *See Bryant v. International Schools Serv., Inc.,* 502 F.Supp. 472 (D.N.J. 1980), *rev'd on other grounds,* 675 F.2d 562, 577 n. 23 (3d Cir.1982); *Seville v. Martin Marietta Corp.,* 638 F.Supp. 590 (D.Md.1986) (adopting *Bryant's* reasoning); *Love v. Pullman Co.,* 13 Fair Empl.Prac. Cas. (BNA) 423, 426 n. 4 (D.Colo.1976), *aff'd on other grounds,* 569 F.2d 1074 (10th Cir.1978).

In amending the ADEA, Congress also had before it the testimony of the EEOC that Title VII applied abroad. *See Age Discrimination and Overseas Americans, 1983: Hearing Before the Subcomm. on Aging of the Senate Comm. on Labor and Human Resources,* 98th Cong., 1st Sess. 3 (1983). Senator Charles Grassley, Chairman of the Subcommittee on Aging of the Committee on Labor and Human Resources, and sponsor of the bill extending the ADEA to citizens employed abroad, stated when he introduced the ADEA amendment that legislation was necessary to correct the unintended "anomaly" of applying the ADEA only domestically, while Title VII was applied both home and

abroad. 129 Cong.Rec. S17,018 (daily ed. Nov. 18, 1983). Thus, there is every indication that when Congress amended the ADEA in 1984, it intended simply to make the scope of the Act coextensive with that of Title VII.[15] It would otherwise seem anomalous that Congress would desire the elimination of extraterritorial workplace discrimination based only on an employee's age, and not on an employee's race, color, religion, sex, or national origin—categories that have traditionally enjoyed heightened constitutional scrutiny and great legislative concern as impediments to equal opportunities.

### International Law

In his panel majority opinion, Judge Davis rejects the evidence of congressional intent to apply Title VII extraterritorially as inadequate, referring to policy considerations—including religious and cultural differences with other nations—that purportedly militate against such an application of the statute. *See Boureslan,* 857 F.2d at 1020. Unless, however, the conflicts of law to which the majority refers rise to the level of a violation of international law, they are not a sufficient basis on which to reject categorically the clear evidence of congressional intent existing in this case.

As I explained in my panel dissent, extraterritorial application of Title VII would not violate international law. *See id.* at 1024–31. I will not here repeat that lengthy discussion. Briefly, applying the test set forth in section 403 of the Restatement (Third) of Foreign Relations Law, it clearly is not unreasonable for the United States to require that American companies comply with Title VII in their employment of United States citizens in other countries: The United States has a strong and legitimate interest in protecting citizens employed abroad by American corporations

**14.** Section 626(b) of the ADEA incorporates 29 U.S.C. § 213(f) of the Fair Labor Standards Act, which excludes "any employee whose services during the workweek are performed in a workplace within a foreign country."

**15.** See also the report of the Committee on Labor and Human Resources, which describes

the amendment of the ADEA to provide for extraterritorial coverage of United States citizens as a "minor change[ ]" in the Act. S.Rep. No. 98–467, 98th Cong., 2d Sess. 2 (1984), *reprinted in* 1984 U.S.Code Cong. & Ad.News 2974, 2975.

from discrimination in employment; Title VII is consistent with the norms of the international community, which has adopted numerous accords condemning discrimination, including discrimination in employment; American citizens have a legitimate expectation that they will not lose the protection of Title VII when they accept a position with the foreign office of an American enterprise; and the potential for conflicts with foreign law are minimized by the fact that the statute applies only to United States nationals and by the BFOQ defense that has been interpreted in an opinion endorsed by this court to exempt an employer from liability where a violation of Title VII is compelled by foreign law. *See Kern,* 577 F.Supp. at 1201.

This is not to say that the exercise of extraterritorial jurisdiction under Title VII would be appropriate in every case. However, the fact that we can hypothesize situations in which a conflict would arise does not mean that the statute must be construed so that it *never* applies abroad. "Because Congress ... can neither anticipate nor resolve all conflicts with foreign jurisdiction," it necessarily relies upon the judiciary to minimize conflicts of jurisdiction by exercising a jurisdictional rule of reason in individual cases. *Laker Airways,* 731 F.2d at 952 n. 169. The Restatement does not purport to eliminate concurrent jurisdiction. Rather, it recognizes that two or more states may exercise jurisdiction over the same activities or individuals when the exercise of jurisdiction by each state is reasonable. The Restatement provides mechanisms for courts to moderate the exercise of jurisdiction when conflicts do arise. This is a process that most courts of appeals, including this one, have employed in other cases involving extraterritorial application of United States law. *See, e.g., American Rice,* 701 F.2d at 414.

The concern voiced by the majority—that extraterritorial application of Title VII will create conflicts of law—is, thus, adequately addressed by the provisions of the statute itself and by the same principles of international law that have traditionally allowed United States courts to moderate their exercise of extraterritorial jurisdiction in the case of actual conflicts of law.

### Conclusion

In enacting Title VII of the Civil Rights Act of 1964, Congress expressed its determination that all Americans are entitled to be free of the intolerable barrier of discrimination in employment based on race, color, religion, sex or national origin. Under the majority's holding, however, Congress's commitment represents merely an empty promise to the thousands of American women and minorities employed in other countries by American multinational firms. Such individuals face the dilemma of accepting an assignment abroad, often considered to be a lucrative opportunity and, in many such multinational enterprises, a prerequisite for career advancement at home, only at the cost of relinquishing the protections and remedies of Title VII upon crossing the territorial borders of the United States. Employment discrimination by American employers against American citizens—wherever practiced—has devastating effects both on the economy of this country and on the dignity and livelihoods of Americans who have come to rely over the past quarter of a century on achievements made possible, in part, by civil rights legislation. The salutary goals of Title VII cannot be fully realized if the fortuitous location of an American employee at the overseas office of an American firm could mean the difference between equal opportunity and discrimination at will.

Congress certainly recognized the potential for abuse represented by American multinational concerns when it enacted Title VII, which must explain its inclusion of section 702 of the Act, the alien exemption clause. Balancing the broad remedial goals of this civil rights statute against the potential conflicts that would arise in attempting to regulate the employment of aliens outside the United States, Congress followed the reasoning of the Supreme Court in *Foley Bros.* and drew an extraterritorial line based on nationality.

There is no justification for disregarding the clear evidence of congressional intent

to apply Title VII to United States citizens employed in other countries by American enterprises. Congress made the judgment in 1964 in Title VII, just as it did again in 1984 in the ADEA amendments, that American nationals employed by United States employers are entitled to the same protection from employment discrimination abroad as they enjoy at home. If we are not to substitute our policy judgments for those of Congress, we must give effect to Congress's intent to apply Title VII extraterritorially. I respectfully dissent from the majority's refusal to do so.